# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

ARMOUR PACKING CO. v. UNITED STATES. SWIFT & CO. v. SAME. MORRIS & CO. v. SAME. CUDAHY PACKING CO. v. SAME.

(Circuit Court of Appeals, Eighth Circuit. April 29, 1907.)

Nos. 2,471, 2,472, 2,473, 2,474.

1. REBATES—CARRIERS — REGULATION OF RATES — ELKINS ACT — JURISDICTION WHEREVER TRANSPORTATION CONDUCTED THEREUNDER.

The giving or receiving of a rebate or concession, whereby property in interstate or foreign commerce is transported at a less rate than that legally filed and published, denounced by the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]), is a continuous crime judicable in any court of the United States having jurisdiction of crimes through whose district the transportation is conducted.

2. CRIMINAL LAW—CONTINUING CRIME PUNISHABLE IN EACH JURISDICTION TO WHICH IT EXTENDS.

A continuing crime is a continuous unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long it may occupy.

Where such an act or series of acts runs through several jurisdictions, the offense is committed and cognizable in each.

Though complete in the jurisdiction where first committed, it may continue, be committed, and punished in another jurisdiction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 220.]

3. CARRIERS—REBATES—CONCESSION FROM PART OF RATE RENDERS TRANSPORTATION THEREUNDER ILLEGAL.

A rebate or a concession from a part of a single rate, whereby property is transported thereunder at a less rate than the established rate, is a concession from the entire rate, and renders all transportation thereunder illegal.

4. SAME—REBATES—INLAND RATES ON THROUGH EXPORTS AND IMPORTS REQUIRED TO BE FILED AND PUBLISHED.

The rates of transportation from places in the United States to ports of transshipment, and from ports of entry to places in the United States, of property in foreign commerce carried under through bills of lading, are required to be filed and published by the amended interstate commerce act of 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]).

If carried under an aggregate through rate which is the sum of the ocean rate and the rate from or to a place in the United States to or from

153 F.—1

the port of transhipment or of entry, the latter rate is required to be filed and published.

If carried under a joint through rate by virtue of a common control, management, or arrangement of the inland and ocean carriers, the joint rate is required to be filed and published.

**5.** COMMERCE—REBATES—INTERSTATE COMMERCE ACT NOT VIOLATIVE OF CONSTITUTION.

The amended interstate commerce act of 1887, thus construed, neither lays a tax or duty on articles exported from any state, nor gives a preference to the ports of one state over those of another, within the meaning of paragraph 5 of section 9 of article 1 of the Constitution, and it is not obnoxious thereto.

**6.** CARRIERS—REBATES—"DEVICE" OF ELKINS ACT IMMATERIAL—INDICTMENT SUFFICIENT WITHOUT PLEADING IT.

The giving or receiving of the rebate or concession, whereby property in interstate or foreign commerce is transported at less than the established rate, is the essence of the offense denounced by the pertinent paragraph of the Elkins act.

The "device" by which the concession or transportation is brought about is not an essential element of the crime, and it is unnecessary to plead it in an indictment.

The meaning of the clause "by any device whatever" in that paragraph is directly or indirectly, in any way whatever.

**7.** CRIMINAL LAW—INDICTMENT—REQUISITE AVERMENTS.

An indictment must set forth facts which the pleader claims constitute the transgression, and every essential element of it, with such clearness and certainty as (1) to advise the accused of the charge he has to meet, and to give him a fair opportunity to prepare his defense, (2) to enable him to avail himself of the judgment thereon in defense of another prosecution for the same offense, and (3) to qualify the court to determine whether or not the facts there stated are sufficient to support a conviction.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, §§ 180–182.]

**8.** CONTRACTS—LAWS READ INTO.

The laws upon the subject of a contract are read into and become a part thereof to the same extent as though they were written into its terms.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 750.]

**9.** CARRIERS—REBATES—CONTRACT TO MAINTAIN ESTABLISHED RATE INEFFECTIVE AFTER HIGHER RATE ESTABLISHED—NO DEFENSE TO CHARGE OF RECEIVING LESS THAN FILED AND PUBLISHED RATE.

A contract between a carrier and a shipper to transport the latter's goods in interstate or foreign commerce at the then established rate for a definite time is ineffective after a higher rate has been filed and published as required by law.

The time during which a rate different from the agreed rate is established by filing and publishing is excepted from the term of such a contract by virtue of the national acts to regulate commerce which are a part thereof.

Such a contract constitutes no defense to a charge of giving or receiving a rebate or concession from the filed and published rate.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 94.]

**10.** CRIMINAL LAW—INTENT—SIMPLE PURPOSE TO DO FORBIDDEN ACT WHICH IS NOT MALUM IN SE IS SUFFICIENT.

The only criminal intent requisite to a conviction of an offense created by statute, which is not malum in se, is the purpose to do the act in violation of the statute. No moral turpitude or wicked intent is essential to a conviction of such a crime.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 22.]

(Syllabus by the Court.)

In Error to the District Court of the United States for the Western District of Missouri.

In the statement and opinion in these cases the Armour Packing Company's case alone will be treated, because the four cases were tried upon agreed statements, and their facts are so similar that the questions of law they present are identical.

The packing company was indicted and tried for, and was convicted of, a violation of the Elkins act to further regulate commerce of February 19, 1903 (chapter 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]) in the District Court for the Western District of Missouri upon these agreed facts: The Chicago, Burlington & Quincy Railroad Company, a corporation, was a common carrier engaged in the transportation of property through the states of the nation and for export to foreign countries by rail over its own road and over other railroads under contracts and arrangements with connecting carriers from Kansas City, in the state of Kansas, into and through the Western district of Missouri, to the city of New York. The packing company was a corporation engaged at Kansas City, in the state of Kansas, in packing meat products and shipping them throughout the United States and to foreign countries. Its shipments to foreign countries were delivered to the Burlington company at Kansas City, were delivered by one of the Burlington company's connecting carriers to an ocean steamer at New York, and were handled exclusively by the carriers, rail and steamship, from the time they were delivered to the Burlington company at Kansas City until they were delivered to the shipper at the export destination. The shipment which is the subject of this prosecution was thus shipped, handled, and delivered.

From May 9, 1905, until August 6, 1905, tariffs and schedules and joint tariffs and schedules duly filed, published, and posted, showed that the proportion of the rate on provisions of the character described herein shipped as export shipments from Kansas City, Kan., to foreign countries, was 23 cents per 100 pounds from all points on the Mississippi river to New York.

On June 16, 1905, the proprietors of the Wilson line of ocean steamers agreed with the packing company to carry these provisions from New York to Christiania, Norway, for 19.93 cents per 100 pounds, and a copy of this contract was delivered to the Burlington company.

On June 17, 1905, the Burlington company agreed with the packing company to carry for it until December 31, 1905, products of this character shipped for export at the then filed and published rate, the proportional part of which from the Mississippi river to New York was 23 cents per 100 pounds.

On August 6, 1905, the Burlington company and its connecting railway carriers filed with the Interstate Commerce Commission an amendment to their tariffs and schedules, which was duly published and posted, and which made a tariff or rate from Kansas City, Kan., to New York, for these products, the proportional part of which for their carriage from the Mississippi river to New York was 35 cents per 100 pounds.

Prior to August 6, 1905, shipments were made by the packing company for export and were carried by the Burlington company and its connecting carriers according to the terms of the contract of June 17, 1905, and at the then filed and published rate. After the amendment of the schedules of August 6, 1905, and on August 17, 1905, the packing company delivered at Kansas City, Kan., to the Burlington company, under the contract of June 17, 1905, for transportation to Christiania, Norway, by way of the latter's railroad and via railroads of its connecting carriers to New York, and thence by the Wilson line of steamships to Christiania, under the contract of the packing company with the owners of that line, 67 tierces of oleo oil, which weighed 29,365 pounds, and the Burlington company received, agreed to deliver this oil to the order of the packing company at Christiania, Norway, and issued to it a through bill of lading therefor for 52.93 cents per 100 pounds, which included the 19.93 cents per 100 pounds agreed by the packing company to be paid to the Wilson line, and left 33 cents per 100 pounds for the transportation from Kansas City, Kan., to New York. The Burlington company and its connecting railway carriers thereupon transported this oil over their railroads from Kansas City, Kan., through the Western district of Missouri,

to New York, where they delivered it to a steamship of the Wilson line. The packing company paid to the Burlington company the full 52.93 cents per 100 pounds for the entire carriage from Kansas City, Kan., to Christiania, Norway. This 52.93 cents per 100 pounds was made up so that the proportionate part of this rate for the carriage from the Mississippi river to New York was 23 cents per 100 pounds. The packing company did not at any time know how the rate was apportioned or made up or divided among the respective railway carriers or points, but it knew that the agreed steamship rate was 19.93 cents per 100 pounds, and hence that 33 cents per 100 pounds was the aggregate amount paid and received for the transportation of the property from Kansas City to New York, and it knew the filed, published, and posted rate for this product established by the amendment of August 6, 1905, the proportional part of which from the Mississippi river to New York was in fact 35 cents per 100 pounds.

The oleo oil was one of the products which the Burlington company agreed to carry, and which it did carry under its contract of June 17, 1905; "the defendant company shipper contending and insisting that said amendment increasing the tariff rate did not and could not abrogate or impair the terms of said contract." One of the connecting carriers objected to transporting this oil at the rate specified in this contract, but the Burlington company insisted that it should be so carried. The result was that the property was transported at a rate the proportional part of which for the carriage between the Mississippi river and New York was 12 cents per 100 pounds less than the part of the rate established by the amendment of August 6, 1905, which was proportionate to that part of the carriage. The packing company was indicted and tried for, and was convicted of, accepting and receiving this concession of 12 cents per 100 pounds in respect of the transportation of this oleo oil in foreign commerce by the Burlington company and its connecting carriers, whereby this property was transported from Kansas City to New York, through the Western district of Missouri, at a less rate than that named in the tariffs published and filed by the Burlington company and its connecting carriers.

Frank Hagerman and John C. Cowin, for plaintiff in error in each case (A. R. Urion, on the brief in No. 2,471, Henry Veeder, on the brief in No. 2,472, and M. W. Borders, on the brief in No. 2,473).

A. S. Van Valkenburgh (Leslie J. Lyons, on the brief), for the United States.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

1. The shipper delivered its goods to the Burlington company, the carrier, obtained its through bill of lading from Kansas City to Christiania, Norway, received its concession, and paid the through rate, less than that named in the tariffs filed and published by the carriers, in the city of Kansas City, in the state of Kansas. By these acts the transportation of this property at this less rate by the Burlington company and its connecting carriers from Kansas City into and through the Western district of Missouri to New York was caused, but the carriage was conducted by the railroad companies alone.

Counsel for the shipper insist that the District Court of the Western district of Missouri was without jurisdiction of its offense, because its crime was not committed in that district, but was complete in the district of Kansas, and because no concession from that part of the rate filed and published which was proportionate to the car-

riage through the Western district of Missouri was charged in the indictment or proved.

If the shipper's offense was complete in the state of Kansas, it may nevertheless have continued and have been committed in the Western district of Missouri also. It is not essential to a continuing crime that every element requisite to its commission in the second jurisdiction wherein it continues shall exist in the jurisdiction in which it is first committed. Larceny is a continuing crime. One who steals in one jurisdiction and carries the stolen property into another may be indicted, tried, and punished in the latter under statutes to that effect, notwithstanding the constitutional requirement that the accused shall be tried in the county or district in which the crime is committed, and this because the carrying into the second jurisdiction is a continuance of the effect of the original taking. Commonwealth v. Macloon, 101 Mass. 1, 5, 6, 100 Am. Dec. 89; People v. Burke, 11 Wend. (N. Y.) 129; Hemmaker v. State, 12 Mo. 453, 51 Am. Dec. 172; 2 Wharton on Conflict of Laws (3d Ed.) §§ 826, 826a. It is said that this rule is based on the legal assumption that where the property has been feloniously taken every act of removal may be regarded as a new taking and asportation. Commonwealth v. Uprichard, 3 Gray (Mass.) 434, 436, 63 Am. Dec. 762; State v. Smith, 66 Mo. 61, 62. But this assumption is only a legal fiction, and, whether made or not, the fact remains that the offense is complete where the felonious taking occurs, and the subsequent asportation to another county or state is not an essential ingredient of the crime in the first jurisdiction, while the felonious taking and its continuing effect are indispensable elements of the offense in the jurisdiction to which the stolen property is carried. Embezzlement is a continuing crime. It may be prosecuted and punished in any jurisdiction where there is liability and failure to account for and pay over the money. In re Richter (D. C.) 100 Fed. 295, 298; Commonwealth v. Parker, 165 Mass. 526, 43 N. E. 499; State v. Bailey, 36 N. E. 233, 236, 50 Ohio St. 636. But the offense is complete in the jurisdiction in which the original conversion is committed, and no subsequent acts in any other jurisdiction are essential elements thereof. The general principle that one who commits a criminal act in one county, state, or district may be held liable for its continuous operation in another to which its effect extends, is established by these and many other authorities, such as those involving the maintenance of a nuisance in one county which affects property in another (Bulwer's Case, 7 Co. 2b, 3b; 2 Hawk. c. 25, § 37; Com. Dig. "Action," N, 3, 11; Abbott, C. J., in King v. Burdette, 4 B. & Ald. 175, 176; Thompson v. Crocker, 9 Pick. [Mass.] 59; Stillman v. Mfg. Co., 3 Woodb. & Min. 538, Fed. Cas. No. 13,446) and those involving the publication of a libel in a newspaper in one jurisdiction which circulates in another (Commonwealth v. Blanding, 3 Pick. [Mass.] 304, 15 Am. Dec. 214), and yet in all these cases the offense may be complete in the jurisdiction in which it is first committed, and still be indictable and punishable in those to which its continuing operation and effect extend.

A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent

force, however long a time it may occupy. Where such an act or series of acts runs through several jurisdictions, the offense is committed and cognizable in each. Wharton's Criminal Pleading & Practice (9th Ed.) §§ 473, 474; People v. Sullivan, 33 Pac. 701, 702, 704, 9 Utah, 195. The transportation of the goods in this case into and through the Western district of Missouri, at the illegal through rate, was the continuing operation and effect in that district of its primary cause, the receipt of the concession and the delivery of the oil by the shipper to the carrier thereunder for transportation in foreign commerce, and even if the shipper's offense was complete in Kansas, it may have been committed in Missouri also, where its operation continued and took effect.

Nor did the fact that no concession was charged or proved from the part of the established rate proportionate to the carriage through the Western district of Missouri extract from that part of the transportation the vice of illegality. The entire transportation from Kansas City to New York was procured by the packing company by accepting a single unlawful concession from that part of the through established rate proportionate to the carriage east of the Mississippi river, but the transportation from Kansas City to New York, and the rate paid therefor, were each single, undivided, and through, and the vice of the illegality in any part of either was unavoidably a vice in the whole and every part of it, so that the carriage into and through the Western district of Missouri under this entire unlawful through rate was as illegal as the transportation over any other part of the route.

Counsel invoke the sixth article of amendments of the Constitution and the inviolable rule of the common law that every accused person shall enjoy the right to a trial in the jurisdiction in which the offense was committed, and the court freely concedes and confirms the position that, if the offense of the packing company was not committed in the Western district of Missouri, the court below was without jurisdiction of this case, and its judgment must be reversed. If the offense was not there committed, the Congress was undoubtedly without power to make it there judicable. They cite: U. S. v. Fowkes, 3 C. C. A. 394, 398, 53 Fed. 13, 17, in which a railroad claim agent in Philadelphia was indicted in Missouri for charging, and receiving from a shipper for the transportation of goods from Philadelphia to Missouri, less than the established rates under the tenth section of the act to regulate commerce approved February 4, 1887 (chapter 104, 24 Stat. 382 [U. S. Comp. St. 1901, p. 3161]), and an application was made to the court in Pennsylvania for his removal to Missouri for trial on the ground that his case was triable there, under section 731 of the Revised Statutes [U. S. Comp. St. 1901, p. 585], because his offense was begun in the Third circuit and completed in the Eighth circuit, although nothing was done in the latter, save that the transportation was there completed, and the court held that the offense was commenced and finished in the state of Pennsylvania and that the court in Missouri was without jurisdiction of it. Davis v. U. S., 43 C. C. A. 448, 104 Fed. 136, in which the defendant was indicted in Texas for committing the fraud of

obtaining by false billing and false representation at Cincinnati in the state of Ohio the transportation of goods from that city to Dallas, in the state of Texas, at less than the established rates, in violation of section 10 of the interstate commerce act, as amended by Act March 2, 1889, c. 382, 25 Stat. 858 [U. S. Comp. St. 1901, p. 3160] and an application for his removal to Texas for trial was presented to the court in Ohio on the ground that the offense was begun in that circuit and ended in the Fifth circuit, under section 731, although nothing occurred in the latter but the completion of the transportation, and the Circuit Court of Appeals of the Sixth Circuit held that the fraud was begun and completed in Cincinnati, and that the offense was not judicable in Texas. Judge Day, now Mr. Justice Day of the Supreme Court, in delivering the opinion of the court, said of the provision, amendatory of the act, denouncing the fraud of false billings: "It is not the transportation of the goods which is prohibited and punished, but the obtaining of the transportation by means of false and fraudulent conduct, which is the gist of the offense. What is it, then, to obtain transportation in the sense of this statute? We think that false billing or other misrepresentation of the goods, as stated in the act, which results in their being received by the carrier under a contract of carriage thus fraudulently obtained, is the obtaining of transportation within the meaning of the statute. Then the fraudulent conduct of the shipper has borne its fruit, and every act and intent which constitutes the offense is complete." 43 C. C. A. 451, 104 Fed. 139. But he also said: "If the carriage of the goods was the thing aimed at in this statute, and such was to have been deemed fraudulent per se, the crime might be regarded as a continuing one." Page 453 of 43 C. C. A., page 142 of 104 Fed. In re Belknap (D. C.) 96 Fed. 614, 616, in which, on an indictment for a violation of the same paragraph of the statute, the District Court of Kentucky reached the same conclusion. U. S. v. Conrad (C. C.) 59 Fed. 458, 462, 463, where the court held that the offense of depositing a lottery ticket or sending it in the mails is complete in the district in which it is deposited or sent, and is not indictable in the district where it is delivered; but that the offense of delivering it by mail may be prosecuted in the district in which it is delivered to the addressee. Dealy v. U. S., 152 U. S. 539, 547, 14 Sup. Ct. 680, 38 L. Ed. 545, in which the Supreme Court held that the offense of conspiracy is complete where the conspiracy is formed, although the overt act is done elsewhere, and many cases in which statutes of states which by their terms authorized the indictment and trial of offenses, which were not continuing, in jurisdictions in which they were not committed, have been held unconstitutional and void. Ex parte Slater, 72 Mo. 102; State v. McGraw, 87 Mo. 161; State v. Hatch, 91 Mo. 568;[1] State v. Anderson, 191 Mo. 134, 144, 145, 90 S. W. 95; Craig v. State, 3 Heisk. (Tenn.) 227; State v. Smiley, 98 Mo. 605, 12 S. W. 247; Dempsey v. State, 22 S. E. 57, 94 Ga. 766; Dougan v. State, 30 Ark. 41; Armstrong v. State, 41 Tenn. 339; Swart v. Kimball, 43 Mich. 443, 5 N. W. 635; Kirk v. State, 41 Tenn. 345; State v. Denton, 46 Tenn. 539; Wheeler v. State, 24 Wis. 52.

[1] 4 S. W. 502.

On the other hand, in Re Palliser, 136 U. S. 257, 267, 10 Sup. Ct. 1034, 34 L. Ed. 514, in which the offense was an offer of money or a tender of a contract for the payment of money, contained in a letter mailed in New York and addressed to a postmaster in Connecticut to induce him to violate his official duty, the Supreme Court said:

"But there can be no doubt at all that, if any offense was committed in New York, the offense continued to be committed when the letter reached the postmaster in Connecticut, and that, if no offense was committed in New York, an offense was committed in Connecticut."

And in Re Huntington (D. C.) 68 Fed. 881, and in Griffee v. Burlington, etc., R. R. Co., 2 I. C. C. R. 301, it was held that the offense of giving an undue preference or advantage to a particular person, in violation of section 3 of the interstate commerce act (24 Stat. 380, c. 104 [U. S. Comp. St. 1901, p. 3155]) was not complete where a free pass had been delivered, unless there was also actual transportation upon the pass.

The opinions in these numerous cases are instructive and interesting; but they are neither controlling nor very persuasive upon the issue it is necessary for us to determine here, because none of the courts which delivered them considered or treated of the act or of the offense here under consideration, and arguments by analogy should always be indulged with caution. In the light of these authorities, two questions condition the jurisdiction of the court below: Was the offense here charged a continuing crime? If it was not, was the actual transportation of the goods an indispensable element of the offense? We turn to the Constitution and to the acts of Congress for the answers. The act which denounces this offense was passed in 1903, six years after the offense of the giving of concessions from the lawful rates by carriers had been created, and four years after the offense of fraudulently obtaining transportation by shippers at less than the regular rates by false representations was established. It was enacted under the power to regulate commerce with foreign nations and among the several states granted to the Congress by article 1 of section 8 of the Constitution. The subject of the act was that part of this commerce which consisted of the transportation of property in it. Its object was to regulate this transportation. There is, there can be, no doubt that the Congress had plenary power, under this commercial clause of the Constitution, to prohibit the transportation of property in interstate or foreign commerce at any less rates than those filed and published under the interstate commerce act of 1887 and its amendments, to make such transportation a continuing crime, to prescribe the penalty for it, and to give to every federal court which had jurisdiction of crimes through whose district any part of this transportation is conducted complete jurisdiction to try, and, if convicted, to punish any person or corporation charged with it. Has the Congress exercised this power? It enacted that:

"It shall be unlawful for any person, persons or corporation to offer, grant or give or to solicit, accept or receive any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier, subject to said act to regulate commerce and the acts amendatory thereto whereby any such property shall by any de-

vice whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced. * * * Every violation of this section shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed or through which the transportation may have been conducted." 32 Stat. c. 708, p. 847 [U. S. Comp. St. Supp. 1905, p. 599].

The offense of the shipper here charged is receiving a concession whereby any property in interstate or foreign commerce shall be transported at less than the legally established rate. Every part of the transportation thus caused is unavoidably violative of this act and illegal, and is necessarily the continuing operation and effect of the unlawful receipt of the concession whereby the carriage is induced. The last clause of the portion of the act quoted above, which, in addition to the court in whose district the violation of the act is committed, confers jurisdiction upon every other court of the United States, which has criminal jurisdiction, through whose district the transportation is conducted, is unconstitutional and void if the offense is not a continuing crime, but valid and effective if it is, and that construction which validates and sustains must be preferred to that which strikes down and paralyzes so plain a provision of a statute. The transportation of the property in the case in hand from Kansas City to New York into and through the Western district of Missouri at a through rate less than that established under the law was the continuing operation and effect of the receiving of the concession and the delivery of the property thereunder by the shipper. These considerations convince that the Congress intended to make, and that by the provision of the act quoted it did make, the offense here charged a continuing crime indictable and punishable in every federal court having jurisdiction of crimes through whose district the illegal transportation is conducted, that the offense in this case is of this nature, that, if the charge in the indictment is true, this offense continued in the illegal transportation it produced into and through the Western district of Missouri, so that it was there committed, and that the court below had jurisdiction of this offense and of the packing company that was charged with its commission. This conclusion renders it unnecessary to determine whether or not the transportation is an indispensable element of the offense in the district in which the concession is received and the goods are delivered to the carrier. But the fact is noted in passing that the giving or receiving of a concession, whereby property is transported at a less rate than that established, is not the only offense created by this act, but also the giving or receiving any concession whereby "any other advantage is given or discrimination is practiced."

2. The concession denounced by the Elkins act is one whereby property in interstate or foreign commerce is transported at a less rate than that required to be filed and published by the amended interstate commerce act of 1887. One of the positions of counsel for the packing company is that no offense was charged or proved against it in this case because railroad rates in the United States upon property in foreign commerce transported from places in the United States to ports of transhipment and thence to foreign countries under through bills of

lading are not required to be filed or published under the act of 1887, and that, if that act contains such a provision, it is violative of article 1, § 9, par. 5, of the Constitution.

In Texas & Pac. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 197, 211, 16 Sup. Ct. 666, 40 L. Ed. 940, the Supreme Court said of this statute:

"The scope or purpose of the act is, as declared in its title, to regulate commerce. It would, therefore, in advance of an examination of the text of the act, be reasonable to anticipate that the legislation would cover, or have regard to, the entire field of foreign and interstate commerce, and that its scheme of regulation would not be restricted to a partial treatment of the subject. * * * Addressing ourselves to the express language of the statute, we find, in its first section, that the carriers that are declared to be subject to the act are those 'engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management or arrangement, for a continuous carriage or shipment, from one state or territory of the United States, or the District of Columbia, to any other state or territory of the United States, or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like manner of property shipped from any place in the United States to a foreign country and carried from such place to a port of transhipment, or shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent foreign country.' It would be difficult to use language more unmistakably signifying that Congress had in view the whole field of commerce (excepting commerce wholly within a state), as well that between the states and territories, as that going to or coming from foreign countries. In a later part of the section, it is declared that 'the term transportation shall include all instrumentalities of shipment or carriage.'" Page 212 of 162 U. S., page 672 of 16 Sup. Ct. (40 L. Ed. 940).

The second, third, and fourth sections of the act forbid unjust discrimination, unreasonable preference, the receipt of greater conpensation for a shorter than for a longer haul by carriers engaged in inland transportation of property in foreign commerce as well as in interstate commerce.

The first sentence of the sixth section reads:

"That every common carrier subject to the provisions of this act shall print and keep for public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its railroad, as defined by the first section of this act."

The first section of the act defines and subjects to its provisions the transportation by rail, and by rail and water combined, of property in foreign commerce shipped from any place in the United States to a foreign country and carried from such place in the United States to a port of transhipment, or shipped from a foreign country to any place in the United States and carried to such place from a port of entry. And it expressly provides that all the provisions of the act shall apply to any common carrier engaged in such transportation and to every instrumentality thereof. It is contended that, although the act may apply to the carriage of property in foreign commerce when consigned from a place in the United States to the port of transhipment for export, to be there again consigned to its destination in the

foreign country, yet it has no application to the transportation of such property under a through bill of lading from the place of the origin of the carriage to the foreign destination. The proposition cannot be sustained. The act is general, comprehensive, includes within its express terms all transportation of property in foreign commerce from the place of origin in the United States to the port of transhipment, and it contains no exception of such carriage under through bills of lading. As the Congress made no such exception, the conclusive presumption is that it intended to make none, and it is not the province of the judicial department to do so. Omaha Water Co. v. City of Omaha, 77 C. C. A. 267, 147 Fed. 1, 13; Madden v. Lancaster County, 12 C. C. A. 566, 572, 65 Fed. 188, 194; Wrightman v. Boone County, 31 C. C. A. 570, 572, 88 Fed. 435, 437; Union Central Life Ins. Co. v. Champlin, 54 C. C. A. 208, 210, 116 Fed. 858, 860.

The sixth section proceeds to require all common carriers subject to its provisions to file and publish schedules and tariffs and joint tariffs and schedules of their rates for all transportation, subject to the act, and closes with the declaration that if any carrier fails to file or publish its schedules or tariffs, as provided in that section, the commissioners may apply to the court "to restrain such common carrier from receiving or transporting property among the several states and territories of the United States, or between the United States and adjacent foreign countries, or between ports of transhipment and of entry and the several states and territories of the United States, as mentioned in the first section of this act until such common carrier shall have complied with the aforesaid provisions of this section of this act." The Congress was evidently of the opinion that this section required carriers engaged in the transportation of property in foreign commerce from places in the United States to ports of transhipment and from ports of entry to places in the United States to file and publish the rates under which this property moved. Otherwise, it would not have authorized the issue of an injunction to restrain them from receiving or transporting property between ports of transhipment and of entry and the several states and territories of the United States, as mentioned in the first section of the act, until they filed and published their rates in compliance with section 6. The Elkins act does not fail to recognize the fact that the interstate commerce act regulates the transportation of goods in foreign, as well as in interstate, commerce. It declares that it shall be unlawful to receive any concession "in respect of the transportation of any property in interstate or foreign commerce subject to such act to regulate commerce," whereby any property shall be transported at a less rate than that filed and published as required thereby.

Counsel argue with much force and great ability that the act does not apply to through export shipments (1) because it does not regulate all commerce or all carriers, but it regulates all carriers by rail, and by rail and water combined, who transport property in foreign commerce from or to places in the United States to or from ports of transhipment or of entry; (2) because ocean rates continually and greatly vary so that through export rates cannot have any permanency, and so cannot be established by filing and publishing, but, if such through

rates may not be thus established, the inland rates to and from the ports can and must be, and to these the ocean rates may be, added, as in the case in hand, and if the through export rates can be thus established, and they are so, they may be filed and published; (3)˙ because the act of 1887 applies to foreign commerce between the ports of transhipment or of entry and the places of its origin or destination in the United States only, but the act requires the rates between those places to be established, filed, and published. If those rates are separate from the ocean rates, they may undoubtedly be separately filed and published, and the ocean rates may be added to make aggregate through rates, as was done in the case under consideration. If by agreement or arrangement between the inland and the ocean carriers or by common control the inland rates become parts of joint through rates, then the latter rates become the rates of transportation to or from the ports of transhipment from or to the places of the origin or destination of the traffic in the United States, and they thereby fall within the terms and the reason of the law.

. The history of this legislation, the evils it was intended to remedy, the objects it was enacted to secure, the instability of the ocean rates, the inconvenience of establishing rates of transportation for property in foreign commerce, the necessary restraint upon this commerce which the subjection of its rates to this act will unavoidably impose and the conceded rule that "laws which create crime ought to be so explicit that all men subject to their penalties may know what acts it is their duty to avoid. * * * Before a man can be punished, his case must be plainly and unmistakably within the statute" (U. S. v. Brewer, 139 U. S. 278, 288, 11 Sup. Ct. 538, 35 L. Ed. 190)—have been ably and persuasively presented in support of the argument that the rates of through export traffic are not within these acts. But where the language of a law is clear, and the signification of its terms is certain, argument from its history and purpose, from its possible or even probable evil effects, and from the inconvenience of complying with it and attempted judicial construction of its expressions, serve only to create doubt and to confuse the judgment. They tend to obscure, rather than to elucidate, the meaning of the statute, and the legislative body must be presumed to have intended what it has expressed. Knox Co. v. Morton, 15 C. C. A. 671, 673, 68 Fed. 787, 789; Shreve v. Cheesman, 16 C. C. A. 413, 416, 69 Fed. 785, 788. The plain terms of the act of 1887, their certain meaning, and the lucid and authoritative interpretation of them by the Supreme Court, which has been quoted, leave no doubt upon this question, and our conclusion is that common carriers subject to the provisions of the act of 1887 to regulate commerce, who are engaged in the transportation of property in foreign commerce under through bills of lading, are required by that act to file and publish their rates for the carriage of the property from its place of shipment in the United States to the port of transhipment and from its port of entry to its place of destination in the United States. If it is carried under an aggregate through rate, which is the sum of the ocean rate and the rate from or to the place in the United States to or from the port of transhipment or of entry, the latter rate is required to be published. If it is carried under a joint through rate by virtue of a com-

mon control, management, or arrangement of the inland and ocean carriers, the joint rate must be filed and published. Texas & Pac. R. Co. v. Interstate Commerce Commission, 162 U. S. 197, 211, 212, 220, 16 Sup. Ct. 666, 40 L. Ed. 940; N. Y. Pr. Ex. v. N. Y. Cen. & Hud. Riv. R. R. Co., 3 Interst. Com. Com'n R. 137; New Orleans Cot. Exch. v. Louisville, N. O. & Tex. R. Co., 41 Interst. Com. Com'n R. 694, 699; In re Tariffs on Export and Import Traffic, 10 Interst. Com. Com'n R. 55, 63, 64, 66, 68, 76, 81.

In the case at bar the property was shipped under a through bill of lading at a through rate which was the sum of the ocean rate agreed upon between the proprietors of the steamship line and the shipper and a railroad rate from Kansas City to the point of transhipment, which was less than the established rate which was required to be and which in fact had been filed and published under the act of 1887. The shipper received a concession of 12 cents per 100 pounds from the part of the established and published rate proportional to the carriage between the Mississippi river and New York, and this constituted an offense under the Elkins act.

But it is said that, if this be the meaning of the amended act of 1887, it is in conflict with article 1, § 9, par. 5, of the Constitution, because it burdens exportation, and gives a preference to the ports of the states reached by the rivers, canals, bays, and sounds over those not thus situated. This burden is alleged to be imposed by the requirements that these rates shall be uniform, filed, and published, only increasable on 10 days' notice, and diminishable on 3 days' notice, and it is freely conceded that these provisions of the act perceptibly impede and restrain both foreign and interstate commerce. But the paragraph of the Constitution first invoked reads: "No tax or duty shall be laid on articles exported from any state." Do the restrictions of the amended interstate commerce act constitute a tax or duty on exports within the meaning of this prohibition? The argument in support of an affirmative answer is that freedom of exportation cannot be impeded in any degree by any legislation, and this contention is founded on these excerpts from the opinion of the Supreme Court in Fairbank v. U. S., 181 U. S. 283, 294, 295, 21 Sup. Ct. 648, 45 L. Ed. 862. In speaking of the earlier decision of that court in Almy v. California, 24 How. 169, 16 L. Ed. 644, to the effect that a tax or duty on a bill of lading was, in substance, a tax or duty on the article shipped, Mr. Justice Brewer, in delivering the opinion of the court, said:

"In other words, that decision affirms the great principle that what cannot be done directly because of constitutional restriction, cannot be accomplished indirectly by legislation which accomplishes the same result."

And again, at page 295 of 181 U. S., page 648 of 21 Sup. Ct. (45 L. Ed. 862), he remarked:

"As the states cannot directly interfere with the freedom of imports, they cannot by any form of taxation, although not directly on the importation, restrict such freedom; Congress alone having the power to prescribe duties therefor. In like manner, the freedom of exportation being guarantied by the Constitution, it cannot be disturbed by any form of legislation which burdens that exportation. The form in which the burden is imposed cannot vary the substance."

But the question under consideration in that case was whether or not a stamp tax on a foreign bill of lading was a tax or duty on the articles described in the bill, and hence a duty on exports, and in conflict with this constitutional provision. To that issue the remarks of the court were addressed, and upon it they were pertinent and authoritative. But they are neither relevant to, nor controlling upon, the question whether or not the Congress may impose incidental restrictions upon foreign commerce under its constitutional power to regulate it. If it may not, then it may not exercise that power, for there can be no regulation without some restriction.

It is a burden or restraint upon exportation by virtue of a tax or duty, and by that alone that is forbidden by the clause of the Constitution here under consideration. The interstate commerce act and its amendments impose no tax or duty upon either foreign or interstate commerce. They were not enacted by virtue of the power of taxation for the purpose of raising a revenue and they raise none.

Again, it is a tax or duty on exportation imposed either directly or indirectly on account of the fact that the articles taxed are exported or are intended for export, and that alone that is obnoxious to this constitutional inhibition, and the restraint of the interstate commerce acts was not imposed upon the transportation of property in foreign commerce because it is exported or intended for export, but upon articles in foreign and interstate commerce alike for the sole purpose of regulating both alike pursuant to the commercial clause of the Constitution. Turpin v. Burgess, 117 U. S. 504, 506, 6 Sup. Ct. 835, 29 L. Ed. 988; Cornell v. Coyne, 192 U. S. 418, 427, 24 Sup. Ct. 383, 48 L. Ed. 504.

The second clause of the paragraph of the Constitution called to our attention reads: "No preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another." Property in foreign commerce which may be transported entirely by water from and to places in the United States on its rivers, canals, sounds, and bays to and from ports of transhipment or of entry is free from, while property in foreign commerce which can be carried from and to the places in the United States to and from ports of transhipment or of entry by rail or partly by rail and partly by water only is subject to the restrictions and burdens of the amended interstate commerce law. Does that law thereby give a preference to the ports of one state over those of another? Counsel contend that this question should be answered in the affirmative, because ports reached by water routes from inland points reap the great and obvious advantage of the freedom of their shippers to contract for the entire carriage, while ports reached from inland places by rail or by rail and water only are deprived of this freedom for their shippers, who must transport their articles subject to the burdens of established uniform inland rates changeable only after ten or three days' notice. The argument might be forceful and persuasive, if addressed to the policy or the justice of the law; but these issues were within the competence of, and have been conclusively determined by, the Congress. The only question which the judiciary can consider is whether or not

the provisions of the act here assailed are unconstitutional. The paragraph of the Constitution before us was enacted for the purpose of preventing Congress from so exercising its power to regulate commerce as to give to one state an advantage over another state by the enactment of a regulation which would prefer the ports of the former to those of the latter. The purpose and the extent of its inhibition are clearly expressed in its terms. It does not forbid a preference of ports of various states reached by inland water routes over those reached by rail, or a preference of those reached by many, over those reached by few, railroads or steamboats, but only those of one, state over those of another. It forbids the preference of the ports of one state because they are located in that state over the ports of another state because they are situated in the latter state. No such preference was intended or effected by the act of 1887 and its amendments, and for this reason these acts do not fall under this constitutional inhibition.

Moreover, the advantage of which complaint is here made is rather that of geographical position, than of legislation. Congress cannot by any law make the advantages of other ports equal to those of one at the mouth of a great river. The alleged preference was not created by any positive enactment for that purpose, nor was it either one of the objects or the chief effect of this legislation. It is, but one of the remote and incidental effects of a general, comprehensive, and undoubtedly beneficial regulation of the transportation of property by rail in the foreign and interstate commerce of the nation under the plenary authority granted by the Constitution. Acts of Congress which are passed in the exercise, and which are within the scope, of one of its undoubted powers, may not be held unconstitutional on account of remote and incidental effects which are clearly within them. Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. 421, 434, 15 L. Ed. 435; South Carolina v. Georgia, 93 U. S. 4, 13, 23 L. Ed. 782.

The interstate commerce act of 1887 and its amendments are not in conflict with article 1, § 9, par. 5, of the Constitution, because they do not lay any tax or duty on articles exported from any state, nor give any preference to the ports of one state over those of another within the meaning of that paragraph.

3. The Elkins act declares the offense of which the defendant was convicted to be the receiving of any concession in respect of the transportation of any property in interstate or foreign commerce, "whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed," as required by the interstate commerce act and its amendments. The judgment of conviction is assailed on the inconsistent grounds that the device by which the property was transported at a less rate than that published and filed was not pleaded in the indictment, and that the court charged the jury that it was essential for them to find that the shipper secured the concession as the result of such a device before they could convict. The latter objection is based on general exceptions to portions of the charge, which declare that both the device and the guilty intent of the defendant are essential to conviction. These exceptions failed to specify or inform the court below whether counsel challenged this charge because in their opinion the guilty intent was

immaterial, or because they thought that the device was unimportant. They now insist, and for the purposes of this decision it is conceded, that a criminal intent on the part of the defendant was indispensable to its conviction, and that the proposition of law embodied in the portion of the charge assailed which declares that rule is correct. But a general exception to a portion of a charge which contains two or more propositions of law is insufficient, if any one of them is sound, because such an exception does not inform the judge which proposition is challenged and give him an opportunity to correct it. St. Louis, I. M. & S. R. Co. v. Spencer, 18 C. C. A. 114, 116, 71 Fed. 93, 95; New Dunderberg Min. Co. v. Old, 38 C. C. A. 89, 94, 97 Fed. 150, 155; Price v. Pankhurst, 3 C. C. A. 551, 53 Fed. 312. For this reason the second ground of objection is untenable and is here dismissed.

The gist of the shipper's offense under paragraph 3 of section 10, as amended by the act of 1889 (25 Stat. 858, c. 382 [U. S. Comp. St. 1901, p. 3160]), is the fraud of obtaining transportation at a rate less than the established rate "by false billing, false classification, false weighing, false representation of the contents of the package or false report of weight or by any other device." Under the familiar maxim, "noscitur a sociis," the device of this paragraph is a device of the same character as the false representations with which it is associated, a deceptive or fraudulent device. Davis v. U. S., 43 C. C. A. 448, 451, 104 Fed. 136, 139. Obtaining transportation at a rate less than the regular published rate, without committing any fraud or making any false representation to secure it, is not unlawful under this act of 1889. And an averment of the fraudulent device by which the transportation is secured is indispensable to an indictment founded upon that act, because the fraudulent device is the substance of the offense. U. S. v. Hanley (D. C.) 71 Fed. 672, 676.

But it is not so with the offense of the shipper denounced by the Elkins act upon which this indictment is based. That act did not repeal, modify, or amend the provision of the act of 1889, which made the obtaining of transportation at a less rate by a fraudulent device a crime. But it created a new offense, the acceptance or receipt of a concession whereby any property in interstate or foreign commerce should be transported by any device whatever at less than the regular filed and published rate. The substance of this offense is not the device, but the solicitation or receipt of the concession and the transportation thereby effected. It may be committed whether the concession is induced by a fraudulent or an honest device, by a shrewd or a simple one, by a secret or an open one. The true meaning of the phrase "by any device whatever" here is directly or indirectly, in any way whatever, and the evident purpose of its use was to emphasize the scope of the law so that it would clearly include the solicitation or receipt of every concession, however obtained, whereby property in interstate or foreign commerce should be transported at less than the regular filed and published rate.

It is conceded that, where a crime is a statutory one, the indictment must set forth with clearness and certainty every essential element of which it is composed. It must portray the facts which the pleader claims constitute the alleged transgression so distinctly as to advise the accused of the charge which he has to meet and to give him a

fair opportunity to prepare his defense, so particularly as to enable him to avail himself of a conviction or an acquittal in defense of another prosecution for the same offense, and so clearly that the court may be able to determine whether or not the facts there stated are sufficient to support a conviction. Ledbetter v. U. S., 170 U. S. 606, 609, 610, 18 Sup. Ct. 774, 42 L. Ed. 1162; U. S. v. Britton, 107 U. S. 655, 669, 670, 2 Sup. Ct. 512, 27 L. Ed. 520; U. S. v. Carll, 105 U. S. 611, 26 L. Ed. 1135; U. S. v. Hess, 124 U. S. 483, 488, 8 Sup. Ct. 571, 31 L. Ed. 516; U. S. v. Cook, 17 Wall. 168, 174, 21 L. Ed. 538; U. S. v. Cruikshank, 92 U. S. 542, 558, 23 L. Ed. 588; U. S. v. Simmons, 96 U. S. 360, 24 L. Ed. 819; Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419; Evans v. U. S., 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830; Miller v. U. S., 66 C. C. A. 399, 403, 133 Fed. 337, 341. The indictment in this case pleads the names of the carriers that transported the property, the date and place of the delivery of the goods to the initial carrier and of the receipt of the concession by the shipper, a description of the specific articles shipped, the filed and published rate, the less rate at which the goods were transported, and the amount of the concession, the place of shipment, and the point of destination of the property, and the route over which it was transported. Here were averments of facts sufficient to clearly advise the defendant of the offense with which it was charged, to give it ample opportunity to prepare its defense, to enable it to avail itself of a conviction or an acquittal in the case of another prosecution for the same crime, and to qualify the court to determine whether the facts stated constituted an offense. The particular device by which the concession and transportation were obtained was not an essential ingredient of the offense charged, because the latter might well exist, whatever the device, and whether or not there was one, and hence the indictment portrayed every material element of the crime without an averment of this device. U. S. v. Tozer, 37 Fed. 635, 637.[2] The substance of the crime of receiving a rebate or concession under the Elkins act is the solicitation, acceptance, or receipt thereof, whereby property in interstate or foreign commerce is transported at less than the regular rate. The device whereby the receipt and transportation are obtained is not an essential element of the crime, and it is unnecessary to plead it in the indictment.

4. On June 17, 1905, when the part of the filed and published rate on the article shipped proportionate to the carriage from the Mississippi river to New York was 23 cents per 100 pounds, the Burlington company agreed with the packing company to carry goods of this character for it until December 31, 1905, at this rate. But the shipment here challenged was made under this contract, and the concession of 12 cents per 100 pounds from the then established rate was received on August 17, 1905, 11 days after the Burlington company and its connecting carriers by an amendment to their tariffs and schedules filed and published, as required by law, had raised the part of the established rate proportionate to the transportation from the Mississippi river to New York to 35 cents per 100 pounds. Did the contract extract the

[2] 2 L. R. A. 444.

vice of illegality from the receipt of the concession and the transportation thereunder?

The amended act to regulate commerce requires carriers subject to its terms to cause tariffs and schedules of their rates to be filed and published, prohibits them from raising the rates thus established on less than ten, and from lowering them on less than three, days' notice, and the Elkins act declares that it shall be unlawful for any person or corporation to give or receive any rebate or concession, whereby any property in interstate or foreign commerce shall be transported at a less rate than that named in the tariffs thus filed and published. If the contract here presented legalizes the receipt of the concession obtained under it, then the courts must add to this provision of the Elkins act the clause, "except where the concession is given or received under a prior contract to transport the property at a less rate which was in force when the agreement was made," or a term of similar import. But the Congress made no such exception. Why should the courts do so? Madden v. Lancaster Co., 12 C. C. A. 566, 573, 65 Fed. 188, 195; Omaha Water Co. v. City of Omaha, 77 C. C. A. 267, 147 Fed. 1, 13.

The validity of the contract is exhaustively discussed; but that is not the test of the legality of the concession. It may be unlawful to perform a valid contract. A man and a woman may make a legal agreement to marry; but, if either marries another, the subsequent performance of the former contract is illegal.

Counsel invoke the conceded rule that carriers engaged in interstate and foreign commerce are free to make contracts relative to the rates and the traffic therein which are not prohibited by the acts to regulate this commerce. Cincinnati, etc., R. Co. v. Interstate Commerce Commission, 162 U. S. 184, 197, 16 Sup. Ct. 700, 40 L. Ed. 935; Interstate Commerce Commission v. Baltimore & Ohio R. Co. (C. C.) 43 Fed. 37; Interstate Com. Commission v. Chicago G. W. Ry. Co. (C. C.) 141 Fed. 1003; Laurel Cotton Mills v. Gulf, etc., R. Co., 37 South. 134, 84 Miss. 339, 66 L. R. A. 453; Southern Pac. Co. v. Interstate Com. Com., 200 U. S. 536, 554, 26 Sup. Ct. 330, 50 L. Ed. 585. But this principle and these authorities leave the question whether or not this contract was prohibited undecided.

The decisions in the early cases of Pond-Decker Lumber Co. v. Spencer, 30 C. C. A. 430, 86 Fed. 846, and Mobile & Ohio R. Co. v. Dismukes, 10 South. 289, 94 Ala. 131, 17 L. R. A. 113, to the effect that contracts for transportation at less than the established rates are valid and enforceable, have been called to our attention. But the rule that agreements by carriers, subject to the national acts to regulate commerce to transport property in interstate or foreign commerce for less than the legal filed and published rates are unlawful and void, has since been so conclusively established that it is no longer open to doubt or discussion. Gulf, etc., R. Co. v. Hefley, 158 U. S. 98, 105, 15 Sup. Ct. 802, 39 L. Ed. 910; Southern Ry. Co. v. Harrison, 24 South. 552, 554, 119 Ala. 539, 43 L. R. A. 385, 72 Am. St. Rep. 936; Texas & Pac. R. Co. v. Mugg, 202 U. S. 242, 245, 26 Sup. Ct. 628, 50 L. Ed. 1011. It is true that in the cases last cited the contracts were made after the higher rates had been filed and published; but the El-

kins act declares the receipt of the concession from the rate filed and published after the execution of such a contract to be illegal in the same terms as it does that from a rate filed and published before the contract is made, since it declares the receipt of every concession from the filed and published rate illegal.

Counsel concede that the carrier and shipper can make no contract that would not be subject to a change in the rate by Congress or by the finding of the Interstate Commerce Commission; but they contend that this agreement was valid at its execution, because it stipulated for the maintenance of the rate then established, that the right of the carrier to raise that rate on 10 days' notice was a privilege which it might waive, that by its agreement to maintain the established rate until December 31, 1905, it waived this privilege until that time, that there is no prohibition in the acts of Congress of a contract to maintain a lawful rate for a reasonable time, that the legal effect of the agreement was to give, not only to the defendant, but to all persons similarly situated, the established rate of June 17, 1905, until December 31st in that year, and that this constituted a lawful contract. If all this were conceded, it would not destroy the baleful effect under the law of the breach of this contract and of the filing and publishing of the higher rate by the carrier. The denunciation as illegal of the giving and of the receiving of a less rate than that so filed and published would still remain. If the legal effect of the agreement was to give all shippers similarly situated the established rate of June 17, 1905, yet that agreement was secret, it was not filed and published, nor was the rate it specified, at the time of the shipment, so that it was not the established rate.

The laws under which the Burlington company is incorporated and the acts of Congress under which it conducts its interstate and foreign commerce constitute a contract between it and the public, whereby the latter have granted to it certain powers which it may not renounce, and imposed upon it certain duties which it may not lawfully disable itself from performing. One of these powers is the authority to establish rates in accordance with the terms of the acts of Congress, and one of these duties is to publicly establish, maintain, and change these rates in compliance with the terms of the acts to regulate this commerce, and the carrier may not lawfully disqualify itself from fully discharging this duty by any contract with a private person or corporation. If such a contract as that in hand were valid, it could not deprive the carrier of its legal right under the acts of Congress to break the agreement and to raise its rates upon 10 days' notice, and the utmost effect of its breach would be to vest in the shipper a cause of action for the damages the latter might sustain.

But the contention that the contract was valid, and that its performance was enforceable after the higher rates were filed and published, ignores a basic rule of the interpretation of agreements and a material part of the contract. That rule is that all laws in existence when an agreement is made necessarily enter into, and form a part of, it as fully as if they were expressly referred to or incorporated into its terms. Van Hoffman v. City of Quincy, 4 Wall. 535, 550, 18 L. Ed. 403; Rees v. City of Watertown, 19 Wall. 107, 121, 22 L.

Ed. 72; Edwards v. Kearzey, 96 U. S. 595, 601, 24 L. Ed. 793; Seibert v. Lewis, 122 U. S. 284, 295, 7 Sup. Ct. 1190, 30 L. Ed. 1161; Southern Ry. Co. v. Bouknight, 70 Fed. 442, 446, 17 C. C. A. 181, 185, 30 L. R. A. 823. And the portion of the agreement ignored is the provision of the amended interstate commerce act (25 Stat. 855, 856 [U. S. Comp. St. 1901, p. 3154]) that carriers subject to it shall file and publish their rates, and that no advance shall be made in them except by filing and publishing the new rates after 10 days' notice, and the provision of the Elkins act, which declares the receipt of every concession from the filed and published rates illegal. When these provisions are read into this agreement, as they must be under the law, its true interpretation is not that the carrier thereby covenanted to renounce until December 31, 1905, its rate-making power over the articles shipped, vested in it by the public, but that it contracted to maintain the existing rate until December 31, 1905, unless that rate was sooner changed in compliance with these provisions of the acts of Congress. This is the rational construction of this contract, because it renders the maintenance of the agreed rate under it enforceable while it was legal, and unenforceable while it was unlawful.

In opposition to these conclusions, counsel invoke the rules that in cases of doubt the interpretation which sustains and enforces a contract should be preferred to that which limits or destroys it, that a construction of a statute which works injustice or great inconvenience should be avoided in favor of a more reasonable interpretation if possible. They portray in vivid colors the great inconvenience, the intolerable restraint upon the freedom of contract, and the inevitable diminution of foreign commerce which will result from a decision that a common carrier may discharge itself from its contract to maintain a rate by changing it in compliance with the national legislation to regulate commerce. But the great purpose of this legislation is to destroy favoritism and to secure equality of rates to all. The authority of Congress, under its power to regulate commerce, to impose the necessary restriction upon the freedom of contract to accomplish this object, is no longer doubtful. It is to this end that carriers are required to file and publish their rates, that they are forbidden to change them except by filing and publishing the new rates after public notice, and that rebates, concessions, preferences, and discriminations are forbidden. If a carrier may lawfully make an enforceable contract with a shipper to maintain an established rate upon future shipments for a definite time, it may make such an agreement with a preferred patron, then file and publish an advanced rate, which will govern like transportation by others similarly situated, and the performance of its contract will give the concession and work the discrimination which the national acts to regulate commerce were enacted to prevent. All carriers may make similar agreements with their shippers and take like proceedings, and the national legislation against rebates, concessions, and discrimination will be futile. The acts of Congress may not be thus evaded. A contract between a carrier and a shipper engaged in interstate or foreign commerce to maintain a filed and published rate for a definite time excepts from

its term by virtue of the national acts to regulate commerce the time during which a different rate is filed and published under the laws. Such a contract constitutes no defense to a charge of giving or receiving a rebate or concession from the filed and published rate. The giving and the receiving of every rebate or concession, whereby property in interstate or foreign commerce is transported at a less rate than that legally filed and published, whether this rebate or concession was obtained under a previous contract or not, is illegal under the Elkins act. Congress made no exception, and it is not the province of the courts to do so.

These conclusions are the logical result of, and are sustained by, the opinion of the Supreme Court in New Haven & Hartford R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 391, 398, 26 Sup. Ct. 272, 50 L. Ed. 515. In the course of the litigation in that case, it became necessary for the Supreme Court to consider and determine the validity of a contract made in 1896 between the Chesapeake & Ohio Company and the New Haven Company, whereby the former agreed to sell and deliver coal, which it bought in West Virginia, at New Haven, in Connecticut, at a fixed price per ton. The Chesapeake & Ohio Company transported the coal from the mines in West Virginia to Newport News and hired its carriage from that place to New Haven. The Interstate Commerce Commission claimed that this contract was illegal, because, when the purchase price of the coal in West Virginia and the cost of transportation from Newport News to New Haven were deducted from the selling price, the amount remaining was less than the filed and published rate from the mines in West Virginia to Newport News. The Chesapeake & Ohio Company answered, among other things, that, when the contract was made, the purchase price of the coal and the cost of the transportation from Newport News to New Haven were so low that their deduction from the selling price left an amount equal to the established rate from the mines in West Virginia to Newport News, and that if subsequently the cost of the coal and of the transportation from Newport News to New Haven increased, so that the compensation of the Chesapeake & Ohio Company for its part of the carriage was less than the established rate, the contract was valid in its inception and continued to be so. Of this contention the court said:

"Further, as the prohibition of the interstate commerce act is ever operative, even if the facts established that at the particular time the contract was made, considering the then cost of coal and other proper items, the net published tariff of rates would have been realized by the Chesapeake & Ohio from the contract, which is not the case, it is apparent that the deliveries under the contract came under the prohibition of the statute whenever for any cause, such as the enhanced cost of the coal at the mines, an increase in the cost of the ocean carriage, etc., the gross sum realized was not sufficient to net the Chesapeake & Ohio its published tariff of rates. This must be the case in order to give vitality to the prohibitions of the interstate commerce act against the acceptance at any time by a carrier of less than its published rates. We say this because we think it obvious that such prohibitions would be rendered wholly ineffective by deciding that a carrier may avoid those prohibitions by making a contract for the sale of a commodity stipulating for the payment of a fixed price in the future, and thereby acquiring the power during the life of the contract to continue to execute it, although a violation of the act to regulate commerce might arise from doing so."

5. Finally, the judgment of conviction is assailed on the grounds that the facts stipulated do not support the charge, and that they disclose no evidence of any criminal intent on the part of the shipper. The charge was that, upon a through shipment from Kansas City to New York for export, the packing company received a concession of 12 cents per 100 pounds from the established rate of 35 cents per 100 pounds for that part of the route between the Mississippi river and New York. The agreed facts were that the tariffs filed and published prior to August 6, 1905, showed the rate for the carriage from the Mississippi river to New York upon products of the character shipped to be 23 cents per 100 pounds; that on June 17, 1905, the carrier contracted with the shipper to transport these products until December 31, 1905, at a rate the proportional part of which from the Mississippi river to New York was in fact 23 cents per 100 pounds; that on August 6, 1905, the Burlington company and its connecting carriers filed and caused to be published an amendment of their schedules and tariffs, which established a new rate the proportionate part of which for the carriage from the Mississippi river to New York was 35 cents per 100 pounds; that on June 16, 1905, the shipper contracted with the proprietors of the Wilson line for the transportation of property of this character from New York to Christiania, Norway, at the rate of 19.93 cents per 100 pounds; that on August 17, 1905, the packing company delivered the shipment to the Burlington company for transportation from Kansas City to Christiania, Norway, under a through bill of lading at the rate of 52.93 cents per 100 pounds, of which 19.93 cents was the agreed ocean rate; that "the full rate for the through carriage was in fact made up so that the proportionate part of the rate for the carriage from the Mississippi river to New York was 23 cents per 100 pounds. The packing company did not at any time know how the rate was apportioned or made up or divided among the respective carriers or points, except that it knew the steamship rate." But "it knew of the filed, published, and posted rate on the character of property embraced in the shipment established by the amendment" of August 6, 1905, and "shipments were made and carried according to the terms of said contract before August 6, 1905, and the provisions and products named in the indictment herein as shipped and carried were carried under said contract; the defendant company, shipper, contending and insisting that said amendment increasing the tariff rate did not and could not impair the terms of the contract." Counsel for the packing company insist that the last clause quoted means that the shipper was contending and insisting at the time of the trial, while the district attorney asserts that it refers to the time when the provisions and products were shipped and carried. The latter construction must prevail, because the paragraph in which this clause occurs relates to the time of the shipment, and not to the time of the trial.

The alleged defect in this proof is that the indictment charged a concession from a rate of 35 cents per 100 pounds shown on the filed and published schedules for the carriage from the Mississippi river to New York, while the agreed facts are that this rate of 35

cents did not appear on the filed and published tariffs and schedules, but it was the part of the rate from Kansas City to New York there published proportionate to the transportation from the Mississippi river to New York. But this was an immaterial variance, because the stipulated facts also show that this 35 cents was in fact the part of the published rate from Kansas City to New York proportionate to the carriage from the Mississippi river to New York; that the packing company knew this published rate, which must have been much more than 35 cents, the part of it proportionate to the carriage east of the river; that it also knew that it was paying 52.93 cents less the ocean rate, 19.93 cents, or only 33 cents, for the entire transportation from Kansas City to New York, a rate which was in fact 2 cents less than the rate proportionate to the carriage east of the river. It must therefore have known that it was receiving a concession from the published rate from Kansas City to New York, and hence a proportionate concession from every part of it, in the absence of proof that the entire concession was accepted from some specific part.

And here also is the evidence of criminal intent, the evidence that the shipper knew it was receiving, and that it intended to secure, a concession whereby its property was transported in foreign commerce at a less rate than that legally filed and published. "Contending and insisting that said amendment increasing the tariff rate did not, and could not, abrogate or impair the terms of said contract," the defendant knew it was receiving, and it intended to secure, a concession from the filed and published rate, knew that it was committing an act which the Elkins act declared to be illegal, and this is the only criminal intent requisite to convict of a statutory offense that is not wrong in itself. A corrupt purpose, a wicked intent to do evil, is indispensable to a conviction of a crime which is morally wrong. But no evil intent is essential to an offense which is a mere malum prohibitum. A simple purpose to do the act forbidden, in violation of the statute, is the only criminal intent requisite to a conviction of a statutory offense, which is not malum in se. Bishop on Statutory Crimes, § 596b; 1 Bishop's Crim. Law (8th Ed.) §§ 343, 345, par. 4.

No question of liability on account of a concession given or received under a mistake of fact or in ignorance of the established rate is presented in this case, because the defendant knew the filed and published rate, and that it was receiving a concession from it. The only mistake it pleads or proves was an error of law, its unfounded belief that by means of a contract with the carrier it could annul or evade the plain declaration of the statute that the concession it received was illegal, and such an error of law excuses no one. Wharton's Crim. Law (9th Ed.) § 84; U. S. v. Anthony, 24 Fed. Cas. 829, 831, 832, No. 14,459; State v. Zichfield, 46 Pac. 802, 805, 806, 23 Nev. 304, 34 L. R. A. 784, 62 Am. St. Rep. 800; State v. Hughes, 58 Iowa, 165, 169, 11 N. W. 706; Hoover v. State, 59 Ala. 57; Reynolds v. U. S., 98 U. S. 145, 167, 25 L. Ed. 244. The agreed facts were sufficient to sustain the judgment, and there was substantial evidence of the criminal intent of the shipper.

Counsel for the shipper have insisted, and the district attorney has denied, that any criminal intent was essential to a conviction of the statutory offense here charged. It has not been necessary to consider or decide, and the court has not considered, and does not decide, that question, because there was ample evidence that the shipper was guilty of the only criminal intent that could be requisite to such a conviction. The case has been determined on the assumption and concession, but not upon a decision that such an intent was indispensable.

A deliberate and patient consideration of the many and grave questions which have been presented in these cases has led to the conclusion that there was no error in their trial, and the judgments below must be affirmed.