POND-DECKER LUMBER CO. v. SPENCER.

(Circuit Court of Appeals, Fifth Circuit. April 12, 1898.)

No. 600.

1. CARRIERS—BREACH OF CONTRACT—INTERSTATE COMMERCE LAW.

Where the agent of a connecting carrier, by mistake, has given to a shipper an unusually low rate on a shipment of a special and unusual character, and the initial carrier, without knowledge of such rate, breaks its contract of carriage by sending the goods over a different road from that prescribed in the bills of lading, so that the shipper is compelled to pay a much higher rate of freight, the initial carrier cannot escape liability for damages on the ground that the rate given was in violation of the interstate commerce law.

2. SAME—MEASURE OF DAMAGES.

In such case the road which willfully misrouted the goods is liable for the entire difference between the rate agreed upon and that which the shipper was compelled to pay, and its liability will not be limited to a lesser sum on the theory that it is only liable for such damages as might reasonably have been in contemplation of the parties when making the contract. 81 Fed. 277, reversed.

Appeal from the Circuit Court of the United States for the Northern District of Georgia.

W. R. Hammond, for appellant.

John T. Glenn, John M. Slaton, and Benj. Z. Phillips, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and SWAYNE, District Judge.

McCORMICK, Circuit Judge. The Pond-Decker Lumber Company, intervener, wished to establish a sawmill plant at Deckerville, in Arkansas. It opened negotiations with the owners of a fully-equipped sawmill plant located at Tallapoosa, Ga., with the intention and expectation, if it purchased the same, to move it by rail from Tallapoosa, Ga., to Deckerville. The most direct railroad route is over the Georgia Pacific Railway to Birmingham, 103 miles; thence, by the Kansas City, Memphis & Birmingham road, to Memphis, 251 miles; and thence, by the Kansas City, Ft. Scott & Memphis road, to Gilmore, Ark., 25 miles. For the two railroads last named, J. J. Fletcher was the general freight agent. Prior to the purchase of the mill plant at Tallapoosa, and pending the negotiations therefor, and with a view to its consummation, the intervener corresponded with Fletcher to ascertain what through rate of fare his roads could give on this freight from Tallapoosa to Gilmore on the basis of there being six or seven car loads of it. Fletcher, as such general freight agent, wrote to the intervener that his roads could deliver the freight from Tallapoosa to Gilmore at the rate of 36 cents per 100 pounds. Thereupon the intervener purchased the sawmill and fixtures at Tallapoosa, and delivered it to the Georgia Pacific Railway, the amount of the freight so delivered being 11 cars instead of 6 or 7, and the gross weight thereof 339,200 pounds. The delivery was made in three lots, for each of which a through bill of lading was taken, on the face of each of which was clearly designated the route by which the cars should be taken, viz. by the Kansas City,

Memphis & Birmingham Railway to Memphis, and the Kansas City, Ft. Scott & Memphis Railroad to Gilmore. The Georgia Pacific Railway Company willfully misrouted the cars, and willfully carried them beyond Birmingham, on its own line, to Winona, in the state of Mississippi, the point where it connects with the Illinois Central Railroad, where it delivered them to that railroad; and it carried them to Memphis, and delivered them there to the Kansas City, Ft. Scott & Memphis Railroad Company, collecting from this latter company fares and charges amounting to 54 cents per 100 pounds for the carriage to that point. When the cars reached Gilmore, intervener tendered its contract price, 36 cents per 100 pounds, to the local agent of the Kansas City, Ft. Scott & Memphis Railroad Company, and demanded the freight, which the local agent declined to deliver, on the ground that the freight had been misrouted; that his company had already paid to the other carriers more than 36 cents per 100 pounds. Intervener then applied to Fletcher, the general freight agent before named, who concurred in the action of the local agent, and declined to order the delivery of the freight upon the payment of the contract rate, on the ground that the freight had been misrouted; that they had had to pay more to the other carriers than the rate contracted for; and demanded, as a condition to the delivery of the freight at Gilmore or at Deckerville, that the intervener should pay 64 cents per 100 pounds instead of 36 cents, which, after considerable delay, the intervener was constrained to do. Thereupon the intervener made its claim against the receiver of the Georgia Pacific Railway Company for the difference between the contract price, of 36 cents per 100 pounds, and the price it had had to pay, amounting to $949.76, and claiming interest thereon from the 8th day of December, 1894, the time when it had to pay the same. Reference of the intervention was made to W. D. Ellis, Esq., as special master, before whom a hearing was duly had, and who made his report thereof on April 11, 1896. He finds and reports as a fact that Fletcher had a right to contract for a through rate from Tallapoosa, Ga., to Gilmore, in the state of Arkansas; that the route by the Georgia Pacific from Tallapoosa to Birmingham, and by the Kansas City, Memphis & Birmingham from Birmingham to Memphis, and by the Kansas City, Ft. Scott & Memphis Railway from Memphis to Gilmore, is the most direct route between Tallapoosa and Gilmore; that there was no rate by the interstate commerce commission on freight like this from Tallapoosa to Gilmore, but that there were local rates on the several lines of road between the various points designated which, combined together to form a consolidated rate, would amount to 66 cents per 100 pounds on this class of freight from Tallapoosa to Gilmore; that the contract to ship this freight at a rate of 36 cents per 100 pounds, made on the part of the railway companies by J. J. Fletcher, agent, was made by mistake on the part of the agent as to the amount of the local rates, but that no fraud or misrepresentation was practiced by intervener in obtaining the rate; that the evidence preponderates in favor of the proposition that the low rate of freight given induced the intervener to purchase the property at Tallapoosa. He finds

and reports (as matter of mixed fact and law) that the defendant accepted the property for shipment, and was bound to send it by the route named in the bills of lading; that the sending of the goods by way of Winona, Miss., was a violation of the contract between the defendant and the Pond-Decker Lumber Company. He finds as a fact that the payment of 64 cents per 100, instead of 36 cents per 100, was directly traceable to the breach of its contract by the Georgia Pacific Railway. He finds that the defendant is liable to the intervener in the sum of $949.76, with interest from the 8th day of December, 1894, at the rate of 6 per cent. per annum. The matter coming on to be heard before the circuit court, on very comprehensive exceptions to the master's report, that court ruled that the intervener is not entitled to recover in the cause the full amount found in its favor by the special master, to wit, the sum of $949.76; that the intervener is not entitled to recover interest on that amount or on any other amount from the 8th day of December, 1894; that the intervener is entitled to recover from defendant the sum of $300, with interest at 6 per cent. per annum from April 11, 1896.

The intervener was allowed to appeal, and assigns as error: (1) The court erred in decreeing that the intervener is not entitled to recover the full amount found in its favor by the special master, the sum of $949.76. (2) The court erred in decreeing that the intervener is not entitled to recover interest on that amount, or on any other amount, from the 8th of December, 1894. (3) The court erred in decreeing that the exceptions taken to the master's report, so far as they are made to the excessiveness of the finding in favor of the intervener, be sustained. The appellee contends that the special contract for 36 cents per 100 pounds was void, because (1) it was in violation of the clause of the interstate commerce act which requires a uniform rate to be charged to all shippers alike, and showed that this was less than the regular rate; and (2) that, even if the contract was binding, the defendant had no notice of its special terms, and would not be bound by the damages, because they were not such as would flow from the tortious act, and would not be within the contemplation of the parties.

It is not suggested that the contract between the intervener and Fletcher without reference to the interstate commerce act was not a valid contract, and one which the intervener could have enforced against the corporations that Fletcher was authorized to bind. Counsel for the appellee have not, either in their oral argument or in their brief, pointed out to us the particular provision or provisions of the interstate commerce act which declare or render the contract between Fletcher and the intervener invalid. When they do undertake to locate the provision or provisions of that act which have that effect, we think they will experience some difficulty. Leaving out of view for the present all consideration of the very exceptional character and amount of this through shipment, intended to have been made over three connecting but independent carriers, starting in one state, passing partly through three other states, and terminating in a fifth state, we think the rule suggested by the contention of counsel would put an unreasonable burden upon shippers. It would require that each shipper should be an expert rate-sheet reader. Besides that, he would

have to visit the local offices of each of the connecting lines, to inspect the rate sheets that are to be posted at certain points according to the requirements of the interstate commerce act, in order to advise himself as to what were the local rates on the connecting carriers between the points at which the separate carriers connected. It would require of him to know or assume as matter of law, which is not law at all, that the carriers could not contract for a through route at a lower rate than the combination of the locals would aggregate. It is expressly provided that in case independent connecting carriers contract or agree with each other for through carriage over their lines, and fix through rates therefor, such joint tariffs shall be filed with the commission (whose office is in the city of Washington); and such joint rates shall be made public when directed by the commission, and the commission shall from time to time prescribe the measure of publicity which shall be given to such rates. Section 6, Act to Regulate Commerce. Must the shipper, before making any contract,—that is, getting any binding rate for through carriage,—make personal investigation or inquiry at the office of the commission in the city of Washington to learn if a through joint rate over the route his goods are to be carried has been filed there, and what are its terms? And if he should make a mistake in any of these inquiries, and obtain a contract with the carrier for a through rate, would his contract be struck with nullity, so that not only the carrier contracted with could plead the mistake and avoid the contract, but any stranger, or, to state it most fairly, either of the other connecting carriers in the route that violated its contract of carriage could question the validity of the contract made for a through rate with all of the others? Undoubtedly, the interstate commerce act purposes to control the carriers in such way as will insure to persons and localities shipping by them just, fair, and equal treatment. It commands many things to be done. It forbids the opposite of these, and any and every evasion of them by commission or omission. It denounces penalties against the carriers, or, where the carrier is a corporation, against its agents, for the doing of the things forbidden, or procuring or abetting the doing thereof, or the omission to do the things required, or the procuring or abetting any person to so offend. It provides remedies for the enforcement of its requirements in reference to just and equal treatment by carriers of all persons and localities for whom they carry. But it nowhere intimates by any express language that contracts made by carriers within the scope of their general powers are to be declared, in any collateral proceeding which may arise, null and void by reason of some alleged or supposed departure from the requirements of that act with reference to the matter of fares and charges. On the contrary, as we read the act, it is strongly implied that the carrier will not only be liable to the government and to any private party injured for its violations of the provisions of the interstate commerce act, but that it will also most certainly be bound on its contract to the party with whom it contracts. If it were otherwise, it would, as we have said, put on shippers a burden too grievous to be borne, and open a door to the practice of fraud and oppression by the agents of corporation carriers.

The opinion of the learned judge of the circuit court, which appears

86 F.—54

in this record, shows that he did not sustain this contention of counsel for the appellee, and that his action on the exceptions to the report was based rather on his partial concurrence in the second suggestion of counsel which we have mentioned. In one part of his opinion he uses this language:

"The contention of counsel for the intervener is, however, that the circumstances surrounding this shipment were such as to put the receivers on notice that a special rate had been given the shippers. What are these circumstances? First. The unusual character of the shipment. It was an entire sawmill, so far as it could be taken down, and it was all shipped at one time. There were eleven car loads embraced in one shipment. Secondly. It was billed to go a particular route. It is claimed that these circumstances are sufficient to put a railroad man familiar with the practice of railroads and freight agents in such matters on notice that a less rate than the regular rate would be given, and that an experienced railroad man would also know that the same could be given without violating the interstate commerce law, or any law, because it was an unusual shipment, and there would be no discrimination or undue preference against other shippers, as no shipment of similar character would ever probably be made. Conceding that the agents of the receiver were put on notice that something less than the usual rate might be allowed for a shipment of this character, can it be held that they must take notice and must contract in contemplation of a mistake on the part of the general freight agent of connecting lines? It is a fact established in the case, and the master so finds, that the rate given by Fletcher, the general freight agent of the connecting lines, being a remarkably low rate when compared with the regular rate, was made by mistake. It cannot be true that the initial carrier can be held to have had in contemplation at the time goods are received for carriage that a connecting line would make a mistake as to the rate on the goods given the shipper. It seems from the facts in this case that the general freight agent was under a misapprehension as to what the regular rate was. Now, if this general freight agent, with a knowledge of what the regular rate was, had made some reasonable reduction from it, and the proof showed that such reduction was usual or even frequent in a shipment of unusual character, and a recovery was based on such facts, there would be some ground for sustaining it under the rule contended for on the part of the intervener."

The evidence clearly establishes that the defendant, not negligently, but willfully, sent the goods by its own line, from Birmingham to Winona, and by the Illinois Central Railroad from Winona to Memphis, and that, by this willful misrouteing, intervener was in fact damaged to the extent found by the special master, viz. $949.76, which it was compelled to part with on the 8th of December, 1894, in order to get its goods. In the case of Langdon v. Robertson, 13 Ont. R. 497, which seems to have exercised a controlling influence over the judgment of the learned judge of the circuit court, it is announced that the measure of damages furnished by the evidence (in that case claimed to be most like this) is either nominal or the full amount paid by the plaintiff; and further on it is said that, if the plaintiff recover, he is entitled to interest from the time he paid. It seems to us that if the delivery to, and receipt by, the Georgia Pacific Company, of this freight, and the routeing of it as required and is conceded in the through bills of lading, was sufficient to put the agents of the receiver on notice that less than the combination of the locals of the connecting independent carriers might have been allowed by the other two, who seem to have been under a common control, and whose freight agent, Fletcher, had a right to contract for a through rate from Tallapoosa, which right he could only have by some contract or agreement, express or implied, with

the Georgia Pacific, it was equally sufficient to put them upon notice or upon that inquiry which, properly pursued, would have secured actual knowledge of the exact terms of the special contract. In this case of willful misrouteing it appears to us to come with very bad grace from the offender to show that, when he was "willing" that he should offend, he should sit down coolly, and calculate what might, could, would, or should be the rate at which these goods had been contracted to be carried, in order that he might ascertain whether he could take the risk, or how much of the risk he would have to take to violate his contract. The defense does not commend itself to our judgment or conscience, especially when made by a party who was the hand of a court of conscience in running this railroad. The rule has been long established that, for negligent breaches of this sort, the liability for the breach is measured by the damages that would be reasonably in the contemplation of the parties, although, where the breach was inadvertent or negligent, there could be no actual contemplation about it, in point of fact; for in such cases we cannot suppose that, at the time of making the contract, the parties contemplated that it would be broken. But, recognizing that one might fail to perform through some oversight, omission, or negligence of servants, such party is held to be charged by the law with liability only for such damage as might reasonably be expected to flow therefrom. The application of this rule to cases that arise is often difficult, and the fact is found to be, as we should reasonably expect it would be found to be, that its application to different cases is as variable as the cases themselves; and the settled current of authority as to such application, if such a settled current has been evolved, is very narrow and limited in its bearing. The case that we are considering presents to us no difficulty whatever. We think the contract with Fletcher was a valid contract. The exact amount of the freight carried is given in pounds. The calculation of the amount that the intervener should have paid, and the amount that it had to pay, and the difference between these amounts showing its exact damage, is a matter of the simplest arithmetic. The date when it had to be paid and was paid is fixed beyond dispute. We therefore concur in the finding of the special master that a decree should be entered in favor of the intervener for the sum of $949.76, with interest thereon at the rate of 6 per cent. per annum from the 8th day of December, 1894; and it is now ordered that the decree appealed from be, and it is hereby, reversed, and the cause remanded to the circuit court, with direction to overrule all of the exceptions to the master's report, and to confirm that report, and thereafter to proceed as equity may require.