UNITED STATES, for Use of JENNINGS et al., v. COOKE et al. (MINNEY et al., Interveners).

(District Court, E. D. Washington, N. D.    August 6, 1913.)

No. 1,581.

1. CONTRACTS (§ 284*)—CONSTRUCTION CONTRACTS—PERFORMANCE—DECISION OF ENGINEER.

It is competent for the parties to a building or construction contract to make it a term of their contract that the decision of an engineer or other officer of all or specified matters of dispute shall be final and conclusive as between them, and in the absence of fraud or mistake so gross as to necessarily imply bad faith the decision of the umpire so selected will not be subjected to the revisory power of the courts.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1292–1302, 1308–1310, 1312–1316, 1326–1338, 1340–1342, 1344–1346, 1350, 1351; Dec. Dig. § 284.*]

2. CONTRACTS (§ 198*)—CONSTRUCTION—EXCAVATION WORK—"ROCK IN PLACE."

Cement gravel held not to constitute "rock in place," within the meaning of provisions of a contract classifying material to be excavated.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 861–877, 879–883; Dec. Dig. § 198.*

For other definitions, see Words and Phrases, vol. 7, p. 6265.]

3. CONTRACTS (§ 47*)—VALIDITY—CONSIDERATION.

A circular letter, sent by the general contractors for government construction work to subcontractors, stating that they had raised the prices on certain classes of the work, held, under the evidence, not to have constituted a contract binding on the contractors for lack of consideration; the proposal being furthermore subject to certain stated conditions, which it did not appear that the subcontractors had fulfilled.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 220, 221, 256–258; Dec. Dig. § 47.*]

At Law.   Action by the United States, for the use and benefit of P. A. Jennings and all other creditors of the defendants, against George Cooke, G. F. Cooke, and W. H. Cooke, copartners as George Cooke & Sons, and the National Surety Company, defendants, in which Homer Minney and W. J. Maxwell, copartners as Minney & Maxwell, James Lineham, W. L. Carpenter, O. F. Leonard, Samuel Bowles, P. O. Berglund, and W. E. Rahier intervened.   Judgment for plaintiffs and interveners.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Post, Avery & Higgins, of Spokane, Wash., for plaintiffs and interveners Minney & Maxwell.

H. J. Snively and Ralph B. Williamson, both of North Yakima, Wash., for interveners Lineham, Carpenter, Leonard, Bowles, Berglund, and Rahier.

Robertson & Miller, of Spokane, Wash., for defendants Cooke & Sons.

E. C. Macdonald, of Spokane, Wash., for defendant National Surety Co.

RUDKIN, District Judge. On the 11th day of April, 1910, the defendants George Cooke & Sons entered into a contract with the United States for the construction of 36 miles of laterals in connection with what is commonly known as the "Tieton project" under the Reclamation Service in Yakima county in this state, according to certain advertisements, proposals, plans, and specifications which were made a part of the contract. At the same time Cooke & Sons executed a bond to the United States in the penal sum of $30,000, with the defendant National Surety Company as surety, conditioned for the faithful performance of this contract and prompt payment to all persons supplying labor and material for the prosecution of the work provided for, as required by the acts of Congress in such cases made and provided. On the 21st day of September, 1911, P. A. Jennings, a subcontractor under Cooke & Sons, commenced an action in this court on the bond in the name of the United States to recover from the contractors and the surety company a balance of $5,181 alleged to be due under the subcontract with Cooke & Sons. Thereafter Minney & Maxwell, James Lineham, W. L. Carpenter, and O. F. Leonard, subcontractors under Cooke & Sons, and Samuel Bowles, P. O. Berglund, and W. E. Rahier, subcontractors under Minney & Maxwell, filed their complaints in intervention, likewise claiming a balance due from the principal contractors and the surety company under the terms of their several contracts.

Issues have been made up, and by stipulation of parties the case was tried by the court without a jury. The original contract and each of the subcontracts classify the material to be removed or excavated in the construction of the laterals as follows:

"Class 1. All material that is loose and can be handled with scrapers, and all material that can be plowed by a six horse team, each animal weighing not less than 1,400 pounds, attached to a suitable plow, all well handled by at least three men; also all loose rocks in pieces not exceeding two cubic feet in volume occurring in loose material or in material that can be thus plowed.

"Class 2. All material not included in classes 1 and 3.

"Class 3. All rock in place that cannot be removed without the use of powder, and all detached masses of rock exceeding ten cubic feet in volume."

The several contracts also contain the following stipulations:

"It is mutually agreed between said parties that to prevent all disputes and misunderstandings between them in relation to any of the stipulations contained in this agreement, or their performance by either of said parties, that the said chief engineer or assistant engineers shall be and hereby is made an umpire to decide all matters arising or growing out of this contract between them."

"It is further mutually agreed and expressly understood that the decision of said chief engineer on any point or matter touching this agreement shall be final and conclusive between the parties hereto, and each and every of said parties hereby waives any and all right of action, suit or suits, or other remedy, in law or otherwise, under this contract, or arising out of the same."

"And the said first party, in consideration of the fulfillment and performance of all the stipulations contained in this contract by said second party, to be by said second party fulfilled and performed, and whenever said work shall have been, in the opinion of said chief or assistant engineers, completely finished in every respect, and performed agreeably to the various stipulations and specifications of this agreement, and said chief or assistant engineers shall have furnished to said first party a certificate of the fact under his hand, together with his estimate of the quantities of the various kinds of work done by said second party under this agreement, which estimate shall be final and conclusive between the parties hereto, will pay to said second party, within thirty days after said certificate and estimate shall have been furnished by said chief engineer, the sum which may be due under this contract, agreeably to said estimates, at the following rates and prices."

The rates differ in the different contracts, but all are based on the same classification. In addition to the construction contract, the contractors further agreed to furnish supplies to the subcontractors at cost, with 10 per cent. added. The contracts for supplies were oral in all cases, and the witnesses naturally differ as to the language used. The terms of the supply contracts, if such they may be called, are perhaps correctly stated in a telegram and letter sent by the contractors to the subcontractor Lineham before the contracts were let. The telegram reads:

"Pay roll and furnishing supplies optional. If we handle, charge 10 per cent."

This was explained in a letter of the same date as follows:

"We stated in our telegram that the handling of the pay roll and furnishing supplies were optional with you. This was in part an error, as we invariably make a stipulation with subcontractors that we shall furnish supplies, for which we charge 10 per cent. above actual cost, including freight. In case, however, you should wish to buy your supplies elsewhere, you would be perfectly free to do this, provided we receive the said 10 per cent. As to the pay roll, this is entirely optional with you. If you wish us to handle it, we will charge the 10 per cent. as stated."

On the 13th day of October, 1910, the contractors sent to the subcontractor Lineham the following letter:

"We have this day raised the prices on various classes of material covered by your contract with us, dated May 2, 1910, as follows:

"Excavation—Class No. 2, .48 (forty-eight cents).
"       —  "   No. 3, 1.00 (one dollar       ).

"Subject to the following provision: That you make a corresponding increase in the prices paid by you to your subcontractors, and that you pay the cost of liability insurance, which amounts to one-half of 1 per cent. of your gross pay roll; also that you complete your work in the time allowed by the government engineer."

Similar letters were sent to all other subcontractors under Cooke & Sons, but the date of the contracts and the amount of the increase were not the same in all cases.

Under the foregoing facts the following claims are made by the respective parties:

First. The subcontractors under Cooke & Sons, other than Jennings and Minney & Maxwell, seek to avoid the force and effect of the certificate of the chief engineer of the Reclamation Service, or his assistants, because of their classification in part of what is commonly known as cement gravel under class 2 and their failure to classify it as "rock in place that cannot be removed without the use of powder, and all detached masses of rock exceeding ten cubic feet in volume," under class 3.

Second. The plaintiff Jennings and all interveners, claim that they were entitled to purchase powder and other explosives from Cooke & Sons under the terms and conditions of the contracts for supplies; whereas, the defendants Cooke & Sons and the surety company claim that powder and other supplies were furnished under a special contract and at a price considerably in excess of that fixed by the supply contracts.

Third. The plaintiff Jennings and all interveners claim that the increase of prices fixed by the letters of October 13th applied and extended to all excavations made under their respective contracts, while the defendants Cooke & Sons claim that the increase only applied to work performed and excavations made subsequent to the date of the letter. The defendant Cooke & Sons and the surety company further claim that the promise to pay the increased rates was without consideration and void.

[1] 1. It is entirely competent for parties to a contract of this kind to make it a term of their contract that the decision of an engineer or other officer of all or specified matters of dispute that may arise duing the execution of the contract shall be final and conclusive as between them, and in the absence of fraud or mistake so gross as to necessarily imply bad faith the decision of the umpire so selected will not be subjected to the revisory power of the courts. United States v. Gleason, 175 U. S. 588, 602, 20 Sup. Ct. 228, 44 L. Ed. 284. And before the contractor can recover any sum in excess of the sum allowed in the final certificate of the engineer, he must show that the latter, in making his final estimate, was guilty of collusion or fraud, or exhibited such an arbitrary and wanton disregard of the rights of the contractor under the contract as to be equivalent to fraud, or that he committed errors or mistakes to the prejudice of the contractor so palpable and so gross as to leave no doubt in the mind of the court that a grave injustice has been done. Fruin-Bambrick Const. Co. v. Ft. Smith & W. R. Co. (C. C.) 140 Fed. 465, 468.

The reasons for this rule are obvious. As said by the court in Choctaw & M. R. Co. v. Newton, 140 Fed. 225, 233, 71 C. C. A. 655, 663, in speaking of a similar contract:

"Such stipulations are evoked out of the experience of railroad companies in such construction work. From its very nature, extending over a long line of road, with diversified topography of country, encountering many varieties of geological formation, and difficulties impossible to anticipate, the variant views and notions of contractors and subcontractors respecting the infinite details of the work, the classification and measurement of material, the prevention of incessant wrangles over the work, with its annoyances and litigation,

justified the railroad company in requiring as a condition precedent to letting the construction of this work, the acceptance of the foregoing provisions of the contract. The contractor is presumed to protect himself against possible loss resulting from any adverse judgment of the engineer by the amount of his bid; and when litigation arises over the decisions and award of such an umpire the courts cannot, without making a new contract for the parties, disregard such positive provisions, or set aside the action of the umpire, except for the most grave and cogent reasons."

[2] Viewing the testimony in the light of this established rule, I am satisfied that the decision or classification made by the engineers of the Reclamation Service must stand. It is not charged that they were guilty of any actual fraud, nor can I find such gross errors or mistakes as would of necessity imply fraud or bad faith on their part. On the contrary, I am inclined to agree with those experts who testified that the classification made was liberal and just to the contractors. While "rock" is a very comprehensive term in geology, in a construction contract such as this the term "rock in place" must have a far more restricted meaning, and it occurs to me that neither hardpan nor cement gravel are properly classified under that head. The expense of excavating the material or the necessity for blasting was not adopted as the criterion for classification. In Wilkin v. Ellensburgh Water Co., 1 Wash. 236, 24 Pac. 460, it was held that cement gravel came within the classification of "earth and gravel" in a contract of a similar kind, and, if so, it could under no possible circumstances be classified as rock in place. In the language of the court in the case cited:

"We cannot, therefore, say that excavating 'cement gravel' was not contemplated by the parties to the contract, or that plaintiffs are entitled to recover compensation for removing it, beyond the price specified. On the contrary, we are of the opinion that the contract price must be the measure of plaintiffs' compensation. Plaintiffs may have made a bad bargain; but, if so, it is their misfortune, and they can be afforded no relief in this action."

2. I am also of opinion that powder and other explosives were not expressly excepted from the contract for supplies, and I see no satisfactory reason why they should be excepted by implication or by reason of custom. But there is another reason why the claim of the defendants cannot be accepted. If these articles were not included in the contract for supplies, the price was not controlled by contract at all, for the act of the contractors in sending slips for each purchase stating a price, against which the purchasers constantly and repeatedly protested, would not and did not establish a contract, express or implied. As a result, therefore, the defendants are at most entitled to offset against the demands of the subcontractors the reasonable value of the powder and other explosives furnished at the time and place of delivery, and no evidence was offered upon that basis. True, some evidence was offered tending to show a general custom among contractors to make an arbitrary charge for powder and explosives, regardless of the actual or reasonable value, or of the time or place of delivery; but such testimony did not establish or tend to establish the market value. The value of the powder and other explosives must therefore be fixed in accordance with the terms of the supply con-

tracts, because there is no other basis upon which the court can act. The testimony satisfies me that under these contracts the contractors were entitled to a net profit of 10 per cent. over and above cost. The fact that they were to receive the 10 per cent. on supplies purchased by subcontractors from third parties affords cogent proof in support of this construction. The defendants will therefore be allowed as an offset against the demands of the plaintiff and interveners the first cost of powder and other explosives, the cost of transportation and handling, to which will be added the 10 per cent. profit reserved to the contractors.

[3] 3. The circular letter of October 13th, mailed or delivered to the various subcontractors, is ambiguous on its face. The expression, "We have this day raised the prices on various classes of material covered by your contract with us," might be construed to apply either to the entire contract or to the uncompleted portions only. The court is therefore at liberty to look to the prior negotiations of the parties and all the surrounding circumstances in order to give effect to their intent. When this is done, I am convinced that the contractors had in mind the entire contract and all excavations included therein; and if the contract is valid, and founded upon a sufficient consideration, it must be enforced as written. The previous negotiations referred to raise a grave doubt in my mind as to the validity of the contract on grounds of public policy. It clearly appears from the testimony that the main object and purpose of the increase was to induce the engineers of the Reclamation Service to give to the contractors, and as a result to the subcontractors, a more favorable classification of material than they had theretofore been receiving. It was the duty of the engineers to classify the material justly and properly—a duty they owed to both the government and the parties—and any contract or agreement entered into for the purpose of influencing them in the discharge of that duty would seem to be against sound public policy and utterly void.

But, aside from this, what was the consideration for the promise to pay the increased prices? First. That the parties to whom the promise was made should make a corresponding increase in prices to their subcontractors. So far as the record discloses, some of them had no subcontractors, and it does not appear that any of them have paid their subcontractors at the increased rate, or that they have obligated themselves so to do. Some of them testified in a general way that they had furnished statements or made settlements; but the testimony in this regard is extremely general and indefinite, and cannot be said to establish a legal obligation on their part. The second requirement was that the subcontractors should pay the liability insurance, which it seems the contractors had taken out in their behalf and probably paid for. At least, none of the subcontractors have paid the liability insurance, or incurred any legal obligation therefor, so far as the record discloses. The third requirement was that the contract should be completed within the time allowed by the government engineers—something the parties were already obligated by contract to do. Perhaps the weight of authority is to the effect that a promise

to do that which a party is already obligated to do by law or by contract is without consideration and void. Many cases hold, however, that if one of the parties to a contract refuses to perform, and the other party promises to pay an increased price in consideration of performance, the latter promise is founded upon a valid consideration. Domenico v. Alaska Packers' Ass'n (D. C.) 112 Fed. 554, and cases cited.

But this case does not fall even within this exception. There is no testimony tending to show that any of the subcontractors refused to perform their contract, so as to support a new promise to pay at an increased rate. On the entire record, I am therefore of opinion that the accounts as stated by the contractors must stand, except as to the items for powder and other explosives. If the parties are unable to agree upon the prices for these items under the rule laid down by the court, the matter will receive further attention at some future day.

Let findings and judgment be prepared accordingly