STAR-CHRONICLE PUB. CO. v. NEW YORK EVENING POST, Inc., et al.

(Circuit Court of Appeals, Second Circuit.    January 20, 1919.)

No. 171.

1. CONTRACTS ⬤⟶26—CONTRACT BY CORRESPONDENCE—OFFER AND ACCEPTANCE.
   Correspondence *held* to contain an offer by defendant and acceptance by complainant, constituting a contract by defendant to furnish complainant for its newspaper daily special cable dispatches from the Peace Conference in Paris, so long as the President remained in Europe.

2. CONTRACTS ⬤⟶147(2)—CONSTRUCTION—INTENTION.
   The primary rule in the construction of contracts is to give effect to the intention of the parties at the time they entered into the contract, and in ascertaining their real intention the courts look to what the par-

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ties said, and if the language used is ambiguous it is to be interpreted in the sense that the promisor knew, or had reason to know, that the promisee understood it.

3. CONTRACTS ⟨⧢⟩155—CONTRACTS BY CORRESPONDENCE — CONSTRUCTION AGAINST PARTY USING WORDS.
   Where a contract is evidenced by correspondence, a letter is construed most strongly against the writer.

4. CONTRACTS ⟨⧢⟩154—CONSTRUCTION—REASONABLENESS.
   An interpretation which evolves the more reasonable and probable contract should be adopted, and every intendment is to be made against a construction under which it would operate as a snare.

5. CONTRACTS ⟨⧢⟩93(1)—VALIDITY—MISTAKE BY ONE PARTY.
   A contract in writing, evidenced by an offer by one party and its unequivocal acceptance by the other, cannot be avoided by the party making the offer, on the ground that it was made through mistake or inadvertence.

6. INJUNCTION ⟨⧢⟩59(1)—SUBJECTS OF PROTECTION—RESTRAINING BREACH OF CONTRACT.
   That a contract was entered into by one party through mistake will not prevent the granting of an injunction against refusal to perform by such party, if complainant is otherwise entitled thereto.

Knox, District Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Star-Chronicle Publishing Company against New York Evening Post, Incorporated, and David Lawrence. From an order denying a motion for preliminary injunction, complainant appeals. Reversed.

This cause comes here on appeal from an order in which a motion for a preliminary injunction was denied. The complainant is a corporation organized under the laws of the state of Missouri, and has its principal place of business in the city of St. Louis in that state. It is engaged in the publication of a daily evening newspaper under the name of the St. Louis Star. The defendant corporation is organized under the laws of the state of New York, and has its principal place of business in the city of New York. The defendant David Lawrence is alleged to be a resident of the city of New York and to be associated in business with the New York Evening Post.

The defendant Lawrence is alleged to have been engaged in writing from Washington, D. C., dispatches dealing with questions of public importance and is said to be a specially and peculiarly qualified Washington correspondent. The New York Evening Post has advertised Lawrence as an "interpreter of political Washington," and as possessing the rare ability to interpret events, political, legislative, diplomatic, in the light of the history of all these fields; as enjoying the implicit confidence of the officials at Washington, and by reason of this fact being able to include in his dispatches information not obtainable by others; as enjoying peculiar opportunities to participate in councils and conferences of importance in Washington which give him particular and peculiar insight into the conditions there. It also advertised to the effect that "what David Lawrence discusses is not obtainable in any other Washington service." It also stated, in soliciting clients for this service, that the newspapers subscribing to it would have the exclusive right for the city in which its paper was published to this service, which service, the defendant stated, would give dignity, authority, and prestige to the paper subscribing for it. His dispatches have been syndicated by the defendants, and also copyrighted, and are published under Lawrence's name in various newspapers in the United States, and it is alleged that they have acquired a reputation for accuracy and for containing important information not otherwise obtainable.

It is averred that the complainant and the New York Evening Post, Incorporated, hereinafter referred to as defendant, entered into a contract by

⟨⧢⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

which it was provided that the latter would furnish the former with the Lawrence dispatches, but that the defendant informed the complainant, contrary to its contract, that after December 31, 1918, it would cease to furnish it with Lawrence's dispatches, and would thereafter furnish the same to its competitor, the St. Louis Post-Dispatch; the St. Louis Star and the St. Louis Post-Dispatch being the two principal evening daily papers published in St. Louis.

The complainant states that it has complied with all the terms and conditions of its contract, and has paid all the sums of money provided for therein, which payments have been accepted by the defendants. The complainant also avers that immediately after its contract was made it advertised in large display advertisements in its own and other newspapers in St. Louis that it had secured the exclusive right to publish the Lawrence dispatches in St. Louis.

The complainant prays:

(1) That the defendant, its servants and agents, and the defendant Lawrence, be enjoined from failing to furnish to the complainant the "Lawrence service" in accordance with the terms of the contract.

(2) That so far as possible the damages sustained by the breach of the contract be ascertained, and that defendants be decreed to pay over the amount thereof to the complainant.

(3) That the defendants be enjoined from furnishing the "Lawrence service" to any other newspaper published in St. Louis.

(4) That defendants be enjoined as aforesaid during the pendency of the action.

(5) That the complainant have such further relief as may be just.

The defendant Lawrence, being in Europe when the action was commenced, was not served, and has not appeared by counsel. The defendant put in no answer, but appeared in the cause by its attorneys.

The complainant on December 20, 1918, obtained an order to show cause, on December 23, why an injunction should not be issued during the pendency of the suit. At the hearing an affidavit, made by the business manager of the defendant, was presented in opposition.

The injunction was denied; the court stating in its opinion that "the facts must, however, be much plainer than they are to enforce upon the defendant a contract which it did not make, and which it had no reason to suppose any one would think it had made."

W. Christy Bryan, of St. Louis, Mo., and Harry D. Nims, of New York City, for appellant.

White & Case, of New York City (Robert Forsyth Little, of New York City, of counsel), for appellees.

Before ROGERS and MANTON, Circuit Judges, and KNOX, District Judge.

ROGERS, Circuit Judge (after stating the facts as above). The common-law courts as a general rule redressed all injuries by giving the party wronged pecuniary damages, and it made no difference whether the action sounded in contract or in tort. It was not so in the courts of equity which afforded in proper cases the remedy of specific performance compelling one who committed a breach of contract to specifically perform his agreement, or enjoined him from not doing as he agreed. This equity did, where money damages afforded an inadequate relief, either because their amount could not be ascertained, or, if ascertainable, would not enable the party wronged to obtain the thing for which he contracted.

In the case under consideration the complainant seeks for an injunction upon the theory that the amount of his damages cannot be ascertained, and that, even if they could be determined, which we think they

could not be, they would not enable it to obtain the information which the Evening Post represented was not obtainable by others than Lawrence, as no other correspondent enjoyed his peculiar opportunities or had his peculiar insight into conditions.

[1] It appears that on June 12, 1917, the complainant and the defendant entered into an agreement whereby the former was to be furnished by the latter the Lawrence dispatches from Washington. That agreement was for one month's trial, with option of renewal. On July 11th of that year the Evening Post wrote the complainant, inquiring whether it would give a definite order for the Lawrence Washington news service until at least January 1, 1918. This offer was accepted, with a request that complainant would give one month's notice, if it desired to continue the service after January 1, 1918. On October 26, 1917, the complainant wrote the defendant that it would like to accept the Lawrence service upon a one-year basis from January 1, 1918, with the understanding that the service would continue indefinitely after the expiration of the one-year agreement unless 60 days' notice was given by either party to the other. On October 30th the defendant wrote complainant that it accepted the revised arrangement. On October 28, 1918, the defendant gave complainant 60 days' notice of the cancellation of the contract on and after January 1, 1919. Then followed telegrams and letters in which complainant sought a reconsideration of the matter; the defendant declining to reopen the matter, inasmuch as it had agreed that the Post-Dispatch of St. Louis was to have the Lawrence service from Washington on and after January 1, 1919. Then on November 15, 1918, the defendant wrote complainant's managing editor as follows:

"Dear Sir: We are planning to send Mr. David Lawrence to the Peace Conference in Europe; if the President goes, he will accompany him on his trip through Europe. We shall write you later as to the details of the arrangement, but are notifying you at this time, in order that you may not in the meantime commit yourselves otherwise. Our plan is to substitute for the time being Mr. Lawrence's service from Washington by a daily cable from Europe.

"There will be only a slight additional cost, due to the cable expenses, but we expect to keep this down to a minimum through the co-operation of the 22 members of the syndicate.

"Will you please advise us as to your willingness to enter into this arrangement, conditioned, of course, on our final decision to send Mr. Lawrence to the Peace Conference."

And on November 18, 1918, David Lawrence wrote the owner of the complainant's paper as follows:

"My Dear Mr. Roberts: Thanks for your letter of November 14th. I had a letter to-day from Mr. Seymour, saying that he felt very uncomfortable about the whole situation, but did not see how the contract with Pulitzer could be broken. I shall be in New York again Friday and Saturday, and learn whether it is an absolute necessity.

"I am planning to go to Europe for the Peace Conference and will be away two months at least. I see not the slightest objection in the world to the making of a special contract between the New York Post and the St. Louis Star for this European service as a substitute temporarily for the Washington service. That would carry at least two months into the new year.

"I shall know more about the whole thing after I have been in New York and will write you then."

On the same day the complainant's general manager wrote the defendant's business manager as follows:

"Dear Sir: In the absence of Mr. Taylor, I am answering your letter of the 15th inst. relative to the possibility that David Lawrence will go to Europe for the Peace Conference, and inquiring whether the Star would be willing to enter an arrangement for his cablegrams. I telegraphed you this morning that it 'certainly would want the Lawrence cables if he goes abroad,' and this message I hereby confirm.

"In this connection may we not assume that the transfer of Mr. Lawrence from Washington to Europe and our acceptance of his cable letters, instead of his Washington letters, would operate to cancel the arrangement which the Evening Post has made with another St. Louis paper for his Washington letters beginning January 1, 1919? It has been with intense regret that we have contemplated the loss of the Lawrence Service, and, as Mr. Roberts has explained to you, we have frankly felt that we were badly treated, and naturally to begin taking his European cables merely to lose them to our competitor just as they start would be most unfortunate for us.

"Therefore may we not hope that you will find in his transfer to Europe another valid reason for continuing his letters (whether domestic or cable) uninterruptedly to the Star?

"Your early reply is requested."

On November 25, 1918, the defendant's business manager sent to complainant's general manager the following letter:

"Dear Mr. Bradley: I have read with great interest and considerable approval your letter of November 18th. It would seem to me entirely possible for this long discussion to end as suggested in the second paragraph of your letter. I will either write or wire you in a day or two more definitely.

"When we wrote you on November 15th concerning our plan to send Mr. David Lawrence to the Peace Conference, we mentioned an additional expense, promising to keep it down to the minimum. The length of time Mr. Lawrence will stay in Europe will depend on the President's plans. He will return to Washington with the President. It is estimated that this trip will take about eight weeks, and that the extra cost will be over $1,300 per week for cable tolls, traveling expenses, etc. Three-quarters of this expense will be borne by the New York Evening Post, and we ask our clients to pay the remainder. In distributing this expense, we ask you to pay us $40 per week, commencing December 9th and until Mr. Lawrence is back in the United States.

"We hope we have made the facts entirely clear, and of course you understand, also, that there will be a period of no daily service while Mr. Lawrence is going over and a second period when he is returning, when you will be paying the regular fee for the service plus the above assessment. In other words, we have worked out the assessment to the above low figure with due consideration for the loss of service while Mr. Lawrence is on the ocean. If we were to assess you for a proportion of the actual cables sent over, it would involve considerable bookkeeping and would charge you a much higher rate of assessment.

"Mr. Lawrence will go abroad when the President sails, and will travel on the same vessel, if that is permitted to correspondents. He will begin filing daily cable dispatches as soon as he arrives in Europe. As in Washington, Mr. Lawrence will not duplicate the routine press association stories, but will send his own signed exclusive news and interpretive dispatches, providing a valuable feature which the routine news cannot give. He will explain what is most vital to American newspapers and their readers, the American point of view at the Peace Conference. He will cable a minimum of 4,500 words weekly, at urgent cable rates to assure its immediate delivery, and his stories will be telegraphed at once from New York to newspapers availing themselves of this service. He will be at the Peace Conference as long as the President remains there, and, should the President visit other foreign capitals, Mr. Lawrence expects to accompany him."

To this on November 27th the complainant replied by a telegram which read:

"Your letter November 25th received. We accept terms on Lawrence cables and are starting to-morrow to advertise big."

And on November 29th the defendant telegraphed complainant as follows:

"Regret cannot supply all of Lawrence Peace cables. Post-Dispatch holds us to contract from January first on. If you prefer to cancel your contract and not start service we will cancel at once. Please advise as Lawrence leaves to-day."

On November 30th defendant telegraphed complainant as follows:

"Unable to alter decision stated in last telegram much to our regret stop will supply Lawrence until December thirty-first according to our contract with you but beyond that we cannot."

On the same day complainant telegraphed defendant as follows:

"Your telegram November twenty-ninth received stop. We are utterly unable to understand your action as your offer of the Lawrence cables to the Star was made repeatedly and all terms accepted by us stop. You knew of the Post-Dispatch complication when you offered them to us stop. We have already publicly advertised the service in the St. Louis newspapers and gave you notice of our intention to do so before we began stop. We now demand that you fulfill your contract with us stop. Please answer promptly."

The learned District Judge was of the opinion that this correspondence did not disclose the contract upon which the complainant relies. We find ourselves unable to take his view of the matter. In the letter of November 25th the defendant proposed unconditionally to furnish the complainant the Lawrence Peace Conference cables, not up to January 1, 1919, but "until Mr. Lawrence is back in the United States," and it asked the complainant to instruct its cashier to put defendant on its payroll until that time.

This proposal the complainant accepted by its telegram of November 27th. To undertake to make this definite proposal conditional because of the first paragraph of the letter is to give to that paragraph a meaning which in our opinion is altogether unwarranted. That paragraph relates to the complainant's letter of November 18, 1918, and that letter dealt with two distinct subjects: (1) The Lawrence Peace Conference cables which the complainant stated it wanted. (2) The Lawrence service from Washington, as to which the complainant asked if the acceptance of the cable letters from Europe might not operate to cancel the arrangement giving the Post-Dispatch the Lawrence service from Washington beginning January 1, 1919.

In view of the unconditional proposal contained in defendant's letter of November 25, 1918, as to the Peace Conference cables, the natural inference it seems to us is to construe the first paragraph of the letter of November 25th as relating solely to the question whether the defendant would cancel its agreement with the Post-Dispatch for the Washington service after Lawrence's return to the United States. It is evident that complainant put that construction on it for in its telegram of acceptance it stated that it was "starting to-morrow to advertise big,"

and in its issue of the next afternoon appeared a full page advertisement which contained in display type the following:

"You can sit in at the Peace Conference. The day to day deliberations of the Peace Conference to be held at an early date in Versailles will shape the future destinies of the peoples of both hemispheres. David Lawrence the Star's special correspondent—the man 'on the inside' at Washington—will accompany the President and the American Peace delegates to Versailles, and will send special cables daily which will appear in St. Louis exclusively in the Star."

It is not probable that such an advertisement would be inserted in a reputable newspaper, if its owner supposed that possibly they had no contract which justified it; and there is nothing in the correspondence that we have been able to discover which indicates on the part of the complainant that it intended to take the cables only down to January 1, 1919. The complainant's letter of November 18, 1918, expressed its unwillingness to enter into any such arrangement as that as being "most unfortunate for us." The practical construction placed on the contract by the complainant the Supreme Court has said "is' always a consideration of great weight." Insurance Co. v. Dutcher, 95 U. S. 269, 273 (24 L. Ed. 410).

[2, 3] The primary rule in the construction of contracts is to give effect to the intention of the parties at the time they entered into the contract. Commonwealth v. West Virginia, 238 U. S. 202, 236, 35 Sup. C. 795, 59 L. Ed. 1272. And in ascertaining their real intention the courts look to what the parties said. Metropolis National Bank v. Kennedy, 17 Wall. 19, 21 L. Ed. 554. If the language used is ambiguous, it is to be interpreted in the sense that the promisor knew, or had reason to know, that the promisee understood it. United States v. Cooke (D. C.) 207 Fed. 682; Nellis v. Western Life Ins. Co., 207 N. Y. 320, 100 N. E. 1119; American Lithographic Co. v. Commercial Casualty Ins. Co., 81 N. J. Law, 271, 80 Atl. 25. Where a contract is evidenced by correspondence, the letter is construed most strongly against the writer. McElravy, etc., Co. v. St. Joseph's Home for Girls (Mun. Ct.) 143 N. Y. Supp. 235.

[4] If the words of a promise may have been used in an enlarged or restricted sense, they will, in the absence of circumstances calling for a different interpretation, be construed in the sense most beneficial to the promisee. White v. Hoyt, 73 N. Y. 505, 511. Where a contract is ambiguous, it will be construed most strongly against the party employing the words concerning which doubt arises. Phœnix Ins. Co. v. Slaughter, 12 Wall. 404, 20 L. Ed. 444; Simon v. Etgen, 213 N. Y. 589, 107 N. E. 1066. The law holds a man responsible for ambiguities in his own expressions, and he has no right to induce another to contract with him on the supposition that his words mean one thing, hoping that a court may make them mean another thing. Blose v. Blose, 118 Va. 16, 86 S. E. 911. If an ambiguity exists in this case, and we think there is none, it arises from the language used by the defendant and not from that used by the complainant; and courts hold that an interpretation which evolves the more reasonable and probable contract should be adopted. Barnsdall Oil Co. v. Leahy, 195 Fed. 731, 115 C. C. A. 521.

And it is very improbable, as we have said, that this complainant would have entered into a contract taking the Peace cables for two weeks only to lose them at the end of that time to their competitor. Every intendment is to be made against a construction of a contract under which it would operate as a snare. Hoffman v. Ætna, 32 N. Y. 405, 88 Am. Dec. 337.

[5] That the first paragraph of the defendant's letter of November 25th related to the Washington dispatches is in fact admitted in the affidavit filed in the case by the writer of that letter. Having made this admission, he then states that the balance of "this letter" was the form of letter sent to all subscribers to the Lawrence syndicate. It is not unlikely that the incorporation of that matter in the defendant's letter to the complainant was a mistake or an inadvertence. But conceding that this was the case does not affect the question which this court has to consider.

In Pollock on Contracts (Williston's 3d Ed.) pp. 563, 564, the writer says:

"Mistake does not of itself affect the validity of contracts at all.   *   *   * The general rule of private law is that mistake as such has no legal effects at all. This may be more definitely expressed as follows: When an act is done under a mistake, the mistake does not either add anything to or take away anything from the legal consequences of that act either as regards any right of other persons or any liability of the person doing it, nor does it produce special consequences of its own."

In Leake on Contracts (Canadian Ed.) p. 211, the law is stated as follows:

"Where there is a mistake in the expression of the agreement, the effect is different in the case of the mistake of one party only, and in that of a mistake common to both. For the simple case of a mistake of one party only in the expression of the agreement, it is sufficient to recur to the elementary principle that the law judges of the matter of an agreement exclusively from the expressions of intention which are communicated between the parties. Consequently, as a general rule, an agreement is not affected by the mistake of either party in expressing the terms of which the other party has no notice or intimation. In the case of an agreement in writing this is no more than an application of the general rule that the written terms cannot be varied by extrinsic evidence of intention; and it is the duty of the court in general to construe and apply an agreement in writing without regard to the views of either party respecting the meaning."

In Page on Contracts, vol. 1, § 79, that writer says:

"Every sane person is held to intend the legal consequences of his voluntary acts. Accordingly, if a person of legal capacity, and not acting under fraud, misrepresentation, duress, or undue influence, goes through the outward form of binding himself by contract, he cannot avoid liability thereon by claiming that unknown to the adversary party, he made his offer or acceptance under mistake of fact, and that he did not intend to make such offer."

And the same writer in section 85 says that—

"While in pure mistake no relief can be given ordinarily where one party has by mistake expressed his intention in terms differing from those intended, a different rule applies where the adversary party knew of such mistake and did not disclose it."

In Black on Rescission and Cancellation, vol. 1, § 131, it is said:

"A party cannot have relief against a contract or other obligation into which he has entered in ignorance of material facts, or under a mistake as to such facts, where no fraud or imposition was practiced upon him, and his ignorance or mistake is entirely due to his own negligence or lack of proper attention, or to the failure to exercise such reasonable care and thoughtfulness as may be expected in business transactions from men of ordinary care and prudence."

In Kerr on Fraud and Mistake (4th Ed.) 477, 478, it is said that—

"The law judges of an agreement between two persons exclusively from the mutual communications which take place between them. If the terms of the proposal of the one are unambiguous and unmistakable, and the answer of the other is an unequivocal and unconditional acceptance the latter is bound, in the absence of fraud or warranty, however clearly he may afterwards make it appear that he was laboring under a mistake in his acceptance of the proposal."

And for like reasons the proposer must be bound although he may have labored under a mistake in making his proposal.

The text-writers have correctly stated the decisions, and we shall refer only to a few. In Tamplin v. James, 15 Ch. Div. 215, 217, it is said that—

"Where there has been no misrepresentation, and where there is no ambiguity in the terms of the contract, the defendant cannot be allowed to evade the performance of it by the simple statement that he has made a mistake."

This court held, in a carefully considered case in which the opinion was written by Judge Wallace, Moffet, Hodgkins & Clarke Co. v. City of Rochester, 91 Fed. 28, 33 C. C. A. 319 (1898), that a court of equity is without power to rescind a contract solely on the ground of a mistake by one party. The complainant in that case had submitted a proposal to do certain public work for the city of Rochester. Its bid for the contract awarded it was $273,000 below that of the next lowest bidder. The evidence satisfactorily proved that it had made two clerical errors in its proposal, one of which amounted to $36,800 and the other to $27,-000, with the result that its bid was $63,800 less than it otherwise would have been. The errors were due to the haste with which the complainant had considered the specifications and prepared its proposals. The cases were fully examined, and the court in its opinion said:

"The salutary power of courts of equity to rescind or reform contracts which do not express the real intention of the parties is not to be extended to cases where the contract, because of the mistake of one of the parties, fails only to express the meaning of that party, and he seeks relief purely on the ground of his own mistake. The correct rule is as stated in Addison on Contracts: 'Where a mistake is unilateral, and the party by whom it was made is the sufferer, relief will not be granted unless there has been some undue influence, misrepresentation, surprise, or abuse of confidence.' 2 Add. Cont. p. 1182."

In Griffin v. O'Neil, 48 Kan. 117, 29 Pac. 143, the court held that a contract was binding upon both parties under the following circumstances: A. made an offer to sell cattle for a stated price, which B. accepted. A. gave B. a bill of sale and received the purchase price. Then A. discovered that in making his offer he had made a mistake in

calculating his figures as to the price. The court said that if the vendor made a mistake in his figures, and the vendee had no knowledge of the mistake, but relied upon the price stated, the vendor was responsible and must suffer.

Where a principal, A., makes a mistake in sending a telegram to his agent, by reason of which the agent makes a contract with B. on behalf of his principal different from that which the principal intended the agent should make, and B. accepts without knowledge of A.'s mistake, it is held that the latter is bound. Hasbrouck v. Telegraph Co., 107 Iowa, 160, 77 N. W. 1034, 70 Am. St. Rep. 181.

In Pond-Decker Lumber Co. v. Spencer, 86 Fed. 846, 30 C. C. A. 430, the Circuit Court of Appeals in the Fifth Circuit held that, where the agent of a railway company wrote a shipper that his railroad would carry his freight to a certain place at the rate of 36 cents per 100 pounds, when the rate was 66 cents per 100 pounds, the fact of the agent's mistake did not prevent the agreement, which the shipper had accepted, from being a valid contract. "We think," said the court, "the contract with Fletcher was a valid contract."

[6] This brings us to a consideration of the remedy. The very meager argument made to this court by defendant's counsel had little to say upon this as upon the other phases of the case. It was, however, stated that the Post-Dispatch had an absolute right to an exclusive publication of the Lawrence service and that the defendant could not be enjoined from delivering the service under its contract with that paper. It is enough to say that the Post-Dispatch has not been made a party to this proceeding, and has not intervened therein, and its rights will not be determined. It is sufficient for our present purpose to know that the defendant has made a valid contract in which it has agreed to furnish to the complainant the Lawrence cables from the Peace Conference, and that the service contracted for is by defendant's own admission unique and peculiar and not otherwise obtainable. That complainant is entitled to receive such European cables, received from Lawrence during the Peace Conference, is clear. It has been held that in many cases a court may decree specific performance although the party against whom the decree is sought entered into the contract through a mistake which he would not have made if he had taken reasonable care. Tamplin v. James, 15 C. D. 217; May v. Platt, [1900] 1 Ch. 616; Swaisland v. Dearsley, 29 Beav. 430, approved by Baggallay, L. J., 15 C. D. 218; Dyas v. Stafford, 7 L. R. I. 606. And if a mistake made by one party to a contract does not prevent a decree of specific performance, it will not prevent the issuance of the injunction if the complainant is otherwise entitled thereto.

It has been sometimes said that the jurisdiction to grant an injunction restraining a breach of contract is substantially coincident with the jurisdiction to grant specific performance, and that it is governed by the same doctrine and rules. When Mr. Pomeroy in 1883 wrote his great work on Equity Jurisprudence, he called attention to the fact that the English courts had more freely used injunctions to prevent the violation of contracts than the majority of the American judges had been willing to do, and declared that the English courts enjoined the viola-

tion of some contracts, even though they could not be specifically enforced, and added:

"The American decisions, with few exceptions, refuse to adopt this doctrine." 4 Pomeroy's Eq. Jur. § 1341.

In 1905, when Mr. Pomeroy's son published the two volumes supplementary to the original work, in alluding to the above statements, he stated that which is undoubtedly true that—

"These remarks have hardly the force, at the present day, that they possessed at the time when they were written. Indeed, the English and American courts appear to have changed places in respect to their attitude towards one important class of contracts, those for personal services." Pomeroy's Eq. Jur., vol. 5, p. 497n.

It is true that, as the jurisdiction to grant an injunction is discretionary, the court in exercising it has regard to the way in which the granting of the injunction will affect the rights of other persons. Hope v. Gloucester Corporation, 1 Jur. N. S. 320; Tubbs v. Esser (1910) 26 T. L. R., 146. But there is nothing in this record which discloses that the equities of the Post-Dispatch are in any wise superior to the equities of the complainant herein.

The order denying the motion for a preliminary injunction is reversed, and the case remanded to the District Court, with directions that the defendant, the New York Evening Post, Incorporated, be enjoined and restrained from refusing and failing to furnish to the complainant the daily cable dispatches which it receives from Europe from its correspondent Mr. Lawrence in accordance with the offer made by it in its letter of November 25, 1918.

It is so ordered.

KNOX, District Judge, dissents.